**Charles S. SPINGOLA, Plaintiff–Appellant,**

v.

**VILLAGE OF GRANVILLE; Keith Blackledge and Jim Mason, Defendants–Appellees.**

**No. 00–3957.**

United States Court of Appeals, Sixth Circuit.

July 11, 2002.

Before SUHRHEINRICH, SILER and BATCHELDER, Circuit Judges.

SILER, Circuit Judge.

This case concerns the constitutionality of Defendant Village of Granville's (the "Village") Ordinance 311.02(A) (the "Ordinance"), which regulates public speaking during parades and assemblages held on the public streets of the Village. Plaintiff Charles S. Spingola challenges the Ordinance as an unconstitutional restriction of his First Amendment rights. The district court denied Spingola's request for preliminary and permanent injunctive relief, and Spingola appeals. We affirm in part and remand for further proceedings.

## BACKGROUND

The Granville Kiwanis Club sponsors an annual Fourth of July Celebration in the Village of Granville, attracting a crowd estimated in the thousands. The celebration is in the "nature of a street fair," occurring in a two-block area of downtown Granville over several days. The two blocks are closed to vehicular traffic.

Spingola characterizes himself as a "confrontational evangelist." In his ministry, he travels around Ohio and other states attending events or positioning himself in locations where he may find a large audi-

ence. He has adopted a preaching style based on audience interaction. Often, he directs his preaching at or in reference to the appearance, attire or apparent lifestyles of those around him. This style of preaching often results in "spirited" responses from members of the crowd, which the Village alleges necessitates police support to maintain the peace around Spingola. He also utilizes various signs and props to accentuate his message, including graphic photos of aborted fetuses and alleged homosexual devices.

In 1998, Spingola attended the Granville Kiwanis Fourth of July celebration and engaged in preaching at various locations in the two-block area. He drew significant crowds of observers. Allegedly, Village officials became concerned that Spingola's crowds substantially impeded and obstructed the flow of pedestrian traffic in the area set aside for the festival.

In June 1999, the Village enacted the Ordinance, which provides that during an assemblage for which a permit has been issued the Village may designate a specific area for the purpose of public speaking and that public speaking shall be confined to the designated area. A person seeking to use the designated public speaking area must obtain a permit from the Village manager. Anyone who engages in public speaking in an area outside the designated area may be prosecuted for criminal trespassing and/or disorderly conduct after receiving an initial warning. The relevant text of the ordinance is, as follows:

(B) During the duration of a permit issued pursuant to paragraph A, within any approved assemblage area, the Village may, as is reasonable and appropriate, designate a specific area or areas within the assemblage area for use by the public for the purpose of public speaking designed to gather crowds and for the free discussion of issues and/or ideas. If such an area is designated, subject to reasonable time, place, and manner restrictions, no mobile advertising and/or public speaking designed to gather a crowd shall be permitted within the assemblage area(s), other than at the designated public speaking area(s).

Within the designated public speaking area(s), the using or operating of any loudspeaker, sound amplifier, or other machine or device for the producing or reproducing of sound which is cast upon the public street or assemblage area for the purpose of commercial advertising or attraction of the attention of the public is prohibited. Natural voice only shall be permitted within the designated public speaking area(s).

The Village reserves the right to limit or cancel the use of the designated public speaking area(s) at any time due to compelling unforeseen or operational circumstances. Every reasonable effort will be made to alleviate the effects of any such limitation.

The use of the designated public speaking area(s) shall be by permit of the Village Manager only. There shall be equal access for all persons or groups to such permits and a permit shall not be unreasonably denied. A permit under this section shall be requested no less than two business days prior to the time the applicant wishes to use the designated public speaking area. For good cause shown, and solely within the discretion of the Village Manager, a request for a permit under this section may be submitted less than two business days before the time the applicant wishes to use the designated public speaking area. Requests for a permit under this section shall include the name, address, and telephone number of the applicant and the date, time, and general nature of the intended use of the designated public speaking area(s). Should two or more requests be made

for use of the designated public speaking area(s) on the same date and time, the designated public speaking area(s) will be scheduled on a first come, first served basis. Conflicting requests will be analyzed on a case by case basis.

The issuance of a permit for use of the designated public speaking area(s) shall not imply endorsement or approval by the Village of Granville of the conduct, objectives, or views of the permit holder.

After receiving an initial warning, whoever violates paragraph B of this ordinance or the terms of the permit issued thereunder may be guilty of criminal trespassing, a misdemeanor of the fourth degree and/or disorderly conduct, a misdemeanor of the third degree, and is otherwise subject to any other civil or criminal penalties provided by state law and the ordinances of the Village of Granville. If in violation of a permit issued under section B of this ordinance, the violator may be removed from the designated public speaking area.

Prior to its enactment, the Village went to the extraordinary step of sending a draft of the proposed ordinance to ACLU President Benson Wolman and Assistant Attorney General Mark Weaver for their consideration. The Village received their respective suggestions, which were incorporated into the final version of the Ordinance.

In June 1999, the Granville Kiwanis Club applied for an assemblage permit pursuant to the Ordinance for the Fourth of July Celebration to be held on the Village streets between June 29 and July 5, 1999. The permit was granted on June 24, 1999. On June 22, 1999, pursuant to the Ordinance, George E. Smock applied for a permit for the use of the designated public speaking area during the Fourth of July celebration for the general purpose of "preaching the Bible by various members of College Community Church." Smock

requested use of the designated public speaking area on June 30 through July 2 from 7:00 PM to 11:00 PM, and on July 3 between 12:00 PM–2:00 PM and 7:00 PM–11:00 PM. The request was granted and a permit was issued on June 25, 1999. Spingola appeared at the Fourth of July celebration and engaged in preaching at the designated location pursuant to the permit issued to Smock. As a result of the Ordinance itself and events that allegedly transpired at the 1999 festival, Spingola brought this action claiming that the Ordinance is unconstitutional because it unduly restricts his freedom of speech and assembly, as well as being unconstitutionally vague.

## STANDARD OF REVIEW

When determining whether to issue a preliminary injunction, the court must consider four factors: (1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction. *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir.1994). In First Amendment cases, the first factor will often be determinative. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998). For a permanent injunction, a party must make a clear showing of a significant threat that irreparable injury will result if relief is not granted, and that no other adequate legal remedy is available. *City of Parma v. Levi*, 536 F.2d 133, 135 (6th Cir.1976). We review for abuse of discretion.

## DISCUSSION

With regard to the injunctive relief sought, the district court addressed only the legal merits of the claim under the First Amendment, which it found dispositive. Likewise, we need not go further.

Before beginning our analysis, however, we observe one significant difficulty in this consideration: what type of claim is Spingola raising? At various times, below and on appeal, he characterizes his claim as both a facial and as-applied challenge of the Ordinance. In its opinion and order denying preliminary and permanent injunctive relief, the district court only addressed whether the Ordinance was unconstitutional on its face. On appeal, Spingola does not challenge the district court's ruling on this basis, and his brief focuses almost exclusively on the facial attack of the Ordinance. Nevertheless, in his second issue on appeal, regarding standards under the Ordinance, an as-applied challenge is mentioned and discussed briefly. Though it heard evidence as to the events that transpired during the June 1999 festival in considering the motion for injunctive relief, the district court made no factual findings regarding the as-applied claim. Accordingly, we will not address the as-applied challenge to the Ordinance and remand that claim for initial consideration. We express no opinion as to whether this claim has any merit.

### A. "Facial" Challenges vs. "As-Applied" Challenges

■ One of the reasons that it was important as a preliminary matter to determine the type of claim raised is that the nature of the challenge affects that standard upon which it is judged. A party attempting a facial challenge carries a "significantly heavier burden" than in a challenge of just a particular application of the law. *See Nat'l Endowment for the Arts v. Finley,* 524 U.S. 569, 580, 118 S.Ct.

2168, 141 L.Ed.2d 500 (1998). In the First Amendment context, this means that a plaintiff who challenges a statute on its face ordinarily must show either that the law admits of no valid application or that, even if one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech. *See Time Warner Entm't Co. v. FCC,* 93 F.3d 957, 967 (D.C.Cir.1996). The Supreme Court has repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied. "Thus, even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation is inappropriate if the remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct." *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (quotation and citation omitted).

As evidenced by this rigorous standard, facial invalidation "is, manifestly, strong medicine" that "has been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). To prevail, a plaintiff must demonstrate a substantial risk that application of the provision will lead to the suppression of speech. *Finley,* 524 U.S. at 580 (citing *Broadrick*).

### B. The Appropriate Constitutional Standard

Freedom of speech "is the matrix, the indispensable condition, of nearly every other form of freedom." *Palko v. Connecticut,* 302 U.S. 319, 327, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (Cardozo, J.). Free speech, however, must be balanced against the state's responsibility to protect other important rights. Pivotal in this inquiry is

the nature of the government restriction. Governmental restrictions on the content of speech pose a high risk that the government really seeks to suppress unwelcome ideas rather than achieve legitimate objectives. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). As a general rule, therefore, the government cannot inhibit, suppress, or impose differential content-based burdens on speech. *Id.* at 641–42 (citations omitted). Nevertheless, courts will uphold such a regulation if necessary to serve a compelling state interest and it is narrowly tailored to the achievement of that end. *See, e.g., Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (citations omitted).

Laws that do not regulate speech *per se*, but, rather, restrict the time, place and manner in which expression may occur are treated differently. Such laws burden speech only incidentally, for reasons unrelated to the speech's content or the speaker's viewpoint. In considering such content-neutral, time, place and manner restrictions, the Supreme Court employs "intermediate scrutiny," upholding limitations on the time, place, and manner of protected expression as long as "they are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (citations omitted).

Spingola does not contest that the Granville Ordinance is "content-neutral," but, nevertheless, argues that strict scrutiny should apply. He bases his argument for strict scrutiny on the fact that he seeks to preach on the "public streets," which have traditionally been one of the purest public forums entitled to "strict scrutiny" of any

restrictions thereon. This assertion, though based on a component of the appropriate analysis, is misguided. The Supreme Court has recognized three types of fora. The first type is a traditional public forum. A traditional public forum is a place "which by long tradition or by government fiat ha[s] been devoted to assembly and debate," such as a street or park. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). As discussed *supra*, in a traditional public forum, though content-based restrictions require "strict scrutiny," content-neutral time, place and manner regulations are permissible if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. The second type of forum has been alternatively described as a "limited public forum" and as a "designated public forum." *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). The government may open a limited public forum "for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Cornelius v. NAACP Legal Def. and Educ. Fund*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Although the government need not retain the open nature of a limited public forum, as long as it does so it is bound by the same standards as apply in a traditional public forum. *Id.* The third and final type of forum is a nonpublic forum. The government may control access to a nonpublic forum "based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Id.* at 806. *See generally Kincaid v. Gibson*, 236 F.3d 342, 348 (6th Cir.2001) (discussing the different fora).

The designated speaking area within the festival perimeters, though comprised of public streets, is not serving in that function during the festival.

> [R]espondents make a number of analogies between the fairgrounds and city streets which have "immemorially been held in trust for the use of the public and ... have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." But it is clear that there are significant differences between a street and the fairgrounds. A street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment. The Minnesota Fair, as described above, is a temporary event attracting great numbers of visitors who come to the event for a short period to see and experience the host of exhibits and attractions at the Fair. The flow of the crowd and demands of safety are more pressing in the context of the Fair. As such, any comparisons to public streets are necessarily inexact.

*Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 651, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (citations omitted). Clearly, the festival area is more akin to a fair than a normal city street. But, regardless of whether we would classify the Granville festival area as a traditional public forum or a limited public forum, as a content-neutral regulation, the Ordinance is examined under the same intermediate level of scrutiny. The government may enforce content-neutral time, place, and manner regulations if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.

## C. Intermediate Scrutiny

### 1. Not Content–Based

■ There is no dispute that the Ordinance is "content-neutral," as permits are given without reference to the content of the proposed speech, and the Ordinance only asks for a "general statement of the intended use." The preaching of Spingola at the festival in the past may have alerted the Village to the need for such a regulation. However, the critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is content-based. *See Hill v. Colorado,* 530 U.S. 703, 719, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (holding that a statute is content-neutral where it does not directly regulate speech, has its origins in a legislative purpose unrelated to disagreement with the underlying message of particular speech, and advances interests unconnected to expressive content); *McGuire v. Reilly,* 260 F.3d 36, 44 (1st Cir.2001) (same). It is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech. *McGuire,* 260 F.3d at 45 (citing *Hill,* 530 U.S. at 723). Therefore, on its face the Ordinance has a content-neutral purpose and regardless of the alleged stimulation for the Ordinance, we look to that stated purpose.

### 2. Significant Governmental Interest

The Village council ascribed several purposes to the Ordinance: to increase public safety during the festival; to ensure smooth traffic flow; and to balance free speech with the rights of persons attending the festival to be free from hindrance. The interests that underlie these purposes are firmly rooted in the state's traditional police powers, and these are precisely the sort of interests that justify some inciden-

tal burdening of First Amendment rights. *See Hill,* 530 U.S. at 718 (noting the "enduring importance of a right to be free from persistent importunity, following and dogging after an offer to communicate has been declined") (citation and quotations omitted); *Schenck v. Pro–Choice Network,* 519 U.S. 357, 376, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (noting the significance of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services"). The Supreme Court recognized these same purposes in *Heffron:* "Because the Fair attracts large crowds, it is apparent that the State's interest in the orderly movement and control of such an assembly of persons is a substantial consideration. As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron,* 452 U.S. at 650 (citations omitted).

Though Spingola may ascribe different motives to the Village, as discussed, we can only look to the purposes rationally served by the Ordinance. "That is a large part of the reason why one who challenges a statute on its face must carry an appreciably heavier burden: a facial challenge, unlike an as-applied challenge, does not allow a reviewing court to base its judgments on actual experience or provide the court any room to capture nuances in a statute's meaning." *McGuire,* 260 F.3d at 47 (citing *United States v. Raines,* 362 U.S. 17, 20–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960) and Richard H. Fallon, Jr., *As–Applied and Facial Challenges and Third–Party Standing,* 113 Harv. L. Rev. 1321, 1330–35 (2000)). Here, there is at least one legitimate reason for the Ordinance, crowd control; thus, it would be premature to declare the Ordinance unconstitutional for all purposes and in all applications. *Id.; United States v. Hilton,* 167 F.3d 61, 71 (1st Cir.1999) (noting that "[i]t makes little sense to strike down an entire statute in response to a facial attack when potential difficulties can be remedied in future cases through fact-specific as-applied challenges").

### 3. Narrowly Tailored

Under the intermediate scrutiny standard, a law is deemed constitutional if it is narrowly tailored to serve significant state interests. The Ordinance is narrowly tailored and leaves available sufficient opportunities to communicate in other ways, such as from the designated forum within the festival. A law is narrowly tailored if it promotes a significant governmental interest that would be less effectively achieved without the law and does so without burdening substantially more speech than is necessary to further this goal. *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citations omitted). Here, the Village has designated a forum of the applicant's choosing, in this case the steps of the courthouse, which is centrally located within the festival area. Spingola argues that the regulation does not relieve the crowding and pedestrian flow obstructions that take place during the festival regardless. That, however, is not the question. The question is whether preventing uncontrolled public speaking in these areas promotes a significant governmental interest that would be less effectively achieved without the law. That is accomplished by providing a smoother flow of traffic within the festival crowd.

### 4. Alternative Channels

The alternative channel for speech has obviously been provided in the form of the designated speaking area within the festival. Also, Spingola could stand anywhere

outside the grounds of the festival if he so chose.

## D. Discretion in Application of the Ordinance

Of course even content-neutral time, place and manner restrictions can be applied in such a manner as to stifle free expression. Where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content. *See Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130–33, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The Supreme Court has thus required that a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review. *Id.* at 131 (citations omitted). The Ordinance provides that speech be permitted in a designated assemblage area on a "first come, first serve" basis, removing any discretion by Village officials to deny permits, perhaps for some basis related to content.

Spingola also contends that the vagueness of the term "crowd" in the statute's prohibition on speech designed to draw a crowd renders the Ordinance unconstitutional: "no mobile advertising and/or public speaking designed to gather a crowd." First, the statute expressly provides that persons who are engaged in such speech outside the assemblage area must be warned before any further action is taken, providing express notice of violative conduct to the extent that it is unclear to a particular individual. Second, as a facial challenge, Spingola bears the burden to demonstrate more than that crowds may occur without such speaking or that speaking may occur without drawing crowds to justify a finding of unconstitutionality. He

must show either that the law admits of no valid application or that, even if one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech. He can prove neither in this case.

AFFIRMED IN PART and REMANDED FOR FURTHER PROCEEDINGS.