*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0147p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

GEORGE SAIEG,

        *Plaintiff-Appellant*,

     *v.*

CITY OF DEARBORN; RONALD HADDAD,
Dearborn Chief of Police,

        *Defendants-Appellees*.

No. 10-1746

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 09-12321—Paul D. Borman, District Judge.

Argued: April 29, 2011

Decided and Filed: May 26, 2011

Before: DAUGHTREY, MOORE, and CLAY, Circuit Judges.

—————————————

## COUNSEL

**ARGUED:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellant. Laurie M. Ellerbrake, Dearborn, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellant. Laurie M. Ellerbrake, Dearborn, Michigan, for Appellees.

     MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. DAUGHTREY, J. (p. 22), delivered a separate dissenting opinion.

—————————————

## OPINION

—————————————

     KAREN NELSON MOORE, Circuit Judge. Each summer, Plaintiff George Saieg attends the Arab International Festival ("Festival") in the City of Dearborn, Michigan ("City"). At the Festival, Saieg leads a group of Christians whose goal is to convert Muslims to Christianity. In 2009, Dearborn police instituted a leafleting

1

restriction for the Festival. Pursuant to the restriction, no one may leaflet from the sidewalks that are directly adjacent to the Festival attractions, or on the sidewalks and roads that surround the Festival's core on each side by one to five city blocks. The restriction permits leafleting at the Festival only from a stationary booth and not while walking around the Festival.

Saieg sued the City of Dearborn and its Chief of Police, alleging that the leafleting restriction violated his First Amendment right to free speech, as well as his freedom to associate, his free exercise of religion, and his right to equal protection. The district court denied a temporary restraining order before the 2009 Festival and granted summary judgment to the defendants in 2010. This court granted Saieg an injunction pending appeal for the 2010 Festival, permitting Saieg to distribute leaflets from the outer sidewalks and roads, but not on the sidewalks that are directly adjacent to the Festival attractions.

On the free speech claim, we **REVERSE** the district court's grant of summary judgment to the defendants and its denial of summary judgment to the plaintiffs. We thereby invalidate the leafleting restriction within both the inner and outer perimeters of the Festival.[1] The restriction on the sidewalks that are directly adjacent to the Festival attractions does not serve a substantial government interest. The City keeps those same sidewalks open for public traffic and permits sidewalk vendors, whose activity is more obstructive to sidewalk traffic flow than pedestrian leafleting is. Moreover, the prohibition of *pedestrian* leafleting in the outer perimeter is not narrowly tailored to the goal of isolating inner areas from *vehicular* traffic. The City can be held liable because the Chief of Police, who instituted the leafleting restriction, created official municipal policy. We **AFFIRM** the district court's judgment for the defendants on all other claims. We **REMAND** to the district court for such further proceedings as are consistent with this opinion that may be warranted.

---

[1] Saieg has not requested the ability to leaflet on the street that contains Festival attractions. As a result, we do not pass judgment on whether a ban on leafleting on that street itself is constitutionally permissible.

## I. BACKGROUND

### A. Substantive Facts

#### 1. The Arab International Festival

The American Arab Chamber of Commerce ("AACC") organizes the Festival, which is free and open to the public. Each year, over 250,000 people attend the Festival, which features carnival rides, a main stage with live entertainment, international food, merchandise sales, a tent targeted at children, and tents in which artisans and other vendors display products. In 2009, forty artisan vendors, twenty-five information tables, fourteen food vendors, and seventeen sponsor booths took part in the Festival. These attractions are all located within the "inner perimeter" of the Festival: the eight blocks of Warren Avenue between Hartwell Street to the west and Kingsley Street to the east, as well as one block south on Miller Road, which intersects Warren Avenue. Due to the scale of the event, officers from the Dearborn Police Department supply extensive security and support the Festival from a "[c]ommand post trailer." R. 47-11 (Ex. K: Haddad dep. at 52). The resolution authorizing the Festival "subject[s]" the Festival to "the rules and regulations of the Police Department." R. 47-13 (Ex. M: Council Resolution)

Businesses located along the inner perimeter on Warren Avenue can obtain permits to display and sell their goods on the sidewalks outside their storefronts. Although the City itself issued the sidewalk permits prior to 2009, the City now delegates authority to issue the permits to the AACC. Businesses and organizations not located on Warren Avenue can purchase an information table. In fact, if businesses or organizations wish to distribute materials, the City's police department *requires* that the distribution occur from a "fixed location," which in practice means an information table located in the street, not on the sidewalk. R. 47-8 (Ex. H: Mrowka dep. at 32). "[H]andbilling along the sidewalks that are adjacent to the [F]estival" is not permitted. R. 47-3 (Ex. C: Beydoun dep. 35). Police officers are expected to warn anyone who distributes leaflets and, if the person continues, to arrest the offender. Dearborn Chief

of Police Ronald Haddad, who assumed his position shortly before the 2009 Festival and has prior experience with crowd control in other capacities, testified that a similar policy is in place at the Michigan State Fair. The Michigan State Fair "will not allow you to give out a paper clip unless you're stationary and at a booth. It just makes good sense, it's a good practice[,] and it's not a standard that is applied indiscriminately[;] it's across the board." R. 47-11 (Ex. K: Haddad Dep. at 95). Fay Beydoun, Executive Director of the AACC, testified that the leafleting policy exists "to make sure that the sidewalks [a]re available, whether it's for the people attending the [F]estival or people [who a]re trying to get from one location to another to go to the businesses" along Warren Avenue. R. 47-3 (Ex. C: Beydoun Dep. at 37); *see also* R. 47-11 (Ex. K: Haddad Dep. at 18) ("[K]nowing that it [i]s going to be a very crowded situation, we . . . do our very best to keep the sidewalks flowing.").

To accommodate Festival traffic, the City barricades the roads within an "outer perimeter" or "buffer zone" that surrounds the inner perimeter. Although the outer perimeter does not contain attractions, it services the Festival by "restrict[ing] traffic," R. 47-8 (Ex. H: Mrowka Dep. at 15), and "giv[ing] [vehicular] traffic some final point to turn away from the Warren Avenue destination," R. 47-11 (Ex. K: Haddad Dep. at 26–27). The outer perimeter also enhances "crowd control [leading] into the [F]estival area." R. 47-8 (Ex. H: Mrowka Dep. at 15). Finally, the outer perimeter includes parking for Festival attendees and vendors, as well as for displaced employees of Warren Avenue businesses and any of those businesses' patrons who are not attending the Festival. R. 47-3 (Ex. C: Beydoun Dep. at 43–44). The outer perimeter stretches one block north of Warren Avenue (Morrow Circle), one block south of Warren Avenue (Blesser Avenue), five blocks west of Hartwell Street (Schaefer Road), and four blocks east of Kingsley Street (Wyoming Avenue).

The restriction on leafleting applies in the outer perimeter area as well. Beydoun explained why: "if you allowed someone to distribute literature within [the] outer area, you might as well allow the other street vendors to set up tables and start selling things

in that area, too.  That is the buffer between going in and going out.  You [have] to maintain a security area."  R. 47-3 (Ex. C:  Beydoun Dep. at 58).

### 2.  Saieg and the Arabic Christian Perspective

Saieg founded the Arabic Christian Perspective ("ACP"), a now-defunct "national ministry established for the purpose of proclaiming the Holy Gospel of Jesus Christ to Muslims.  As part of its outreach efforts, ACP travel[ed] around the country attending and distributing Christian literature at festivals and mosques."  R. 13 (Amended Compl. ¶ 9).  Because the City is home to a "big Muslim community," the Festival provides Saieg the opportunity to evangelize "thousands of Muslims in one place."  R. 48 (Ex. A:  Saieg Dep. at 42, 44).  Before each Festival, the ACP operated an annual event called "Facing the Muslim Challenge."  In 2009, the program featured panel discussions, workshops on "[e]ffectively witnessing to Muslims," debates, door-to-door outreach, and mosque tours.  R. 47–2 (Ex. B:  Program).  The program culminated in outreach at the Festival.  At each Festival from 2004 to 2008, Saieg and 90 to 120 ACP members distributed leaflets from the public sidewalks that abut Warren Avenue.

In 2009, Saieg had planned for 90 ACP members to continue the practice of leafleting while roaming the Festival.  However, when Saieg shared these plans with a City police sergeant, Saieg learned that the new Chief of Police, Chief Haddad, would not permit anyone to distribute leaflets while walking around the Festival.  Instead, the City provided the ACP with a booth, waiving the standard fee.  The booth was poorly lit and located by carnival rides, which attracted mostly children.  This problem was remedied in 2010, when the ACP's booth was lit and located "in the central area."  *Saieg v. City of Dearborn*, 720 F. Supp. 2d 817, 834–35 (E.D. Mich. 2010) (describing then-upcoming plans for the 2010 festival).  Saieg also faces a more basic problem with booth-based evangelism:  "[t]he penalty of leaving Islam according to Islamic books is death," which makes Muslims reluctant to approach a booth that is publicly "labeled as . . . Christian."  R. 48 (Ex. A:  Saieg Dep. at 75).  Saieg believes that evangelism is more effective when he can roam the Festival and speak to Muslims more discreetly.  The ACP distributed 37,000 packets of religious materials in 2007 and 20,000 packets in

2008, but only 500 packets in 2009 due to the remote, fixed location. Numbers from 2010 are not in the record.

## B. Procedural History

On June 16, 2009, Saieg and ACP sued the City and Chief Haddad for violating their First Amendment rights to free speech, free association, and free exercise of religion, in addition to violating the Equal Protection Clause. Saieg has specified that "this is not a facial challenge" to the leafleting restriction but "an as-applied challenge." Appellant Br. at 38. Moreover, Saieg has "at *no* time . . . requested to engage in his religious activity on Warren Avenue or Miller Road," although he has asked to leaflet on the sidewalks that are adjacent to those roads. *Id.* at 2. The plaintiffs sought declaratory and injunctive relief, attorney fees and costs, and nominal damages. Two days after the plaintiffs filed their complaint, the district court denied a temporary restraining order. At the 2009 Festival, the plaintiffs distributed leaflets from the inconveniently located booth.

The ACP was dismissed from the case after the organization dissolved. On June 7, 2010, the district court denied Saieg's motion for summary judgment and granted summary judgment to the defendants. The district court held that the leafleting restriction was a valid time, place, and manner restriction, relying heavily on *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640 (1981), and the Sixth Circuit's application of *Heffron* in *Spingola v. Village of Granville*, 39 F. App'x 978 (6th Cir. 2002) (unpublished opinion). The district court reasoned that Saieg retains alternative channels of communication, even though they are not his preferred channels, because he could "orally propagat[e] [his] religious views," distribute materials from a booth, and distribute materials outside of the Festival. *Saieg*, 720 F. Supp. 2d at 834–35. The leafleting restriction is content neutral, said the district court, because permitting Warren Avenue businesses to have sidewalk sales "favor[s], if anyone, those with space along Warren Avenue no matter who they are or what their message" is. *Id.* at 837. The leafleting restriction serves a substantial government interest "in ensuring the orderly flow of pedestrian traffic through the crowded Festival." *Id.* at 838. Finally, the district

court found that the restriction is narrowly tailored because allowing everyone to distribute leaflets in the outer perimeter area would "effectively extend the Festival grounds into an area that is meant to serve as a buffer zone between the Festival and the outside world." *Id.* at 840. Even though streets and sidewalks are traditionally public fora, "[f]or three days out of the year, the streets and sidewalks of the outer perimeter . . . are serving an entirely different role." *Id.* The district court found that Saieg had abandoned his free exercise claim, and also disposed of the freedom of association and equal protection claims. Finally, the district court found that the City was not liable under 42 U.S.C. § 1983 because there was no constitutional violation. The four instances of selective enforcement that Saieg highlighted were "insufficient to show that selective enforcement . . . was so widespread as to have the force of law," and Saieg had not shown that the selective enforcement stemmed from official policy. *Id.* at 844 (internal quotation marks omitted).

Saieg appealed to the Sixth Circuit and filed an emergency motion for expedited review. On June 17, 2010, this court ruled that Saieg was likely to succeed on the merits of his claim because, although *Heffron* and *Spignola* "may support the restriction of leaflet distribution among the crowds within the core area of the Festival, they do not appear to preclude similar activity in the 'outer perimeter' or 'buffer zone' leading up to the core area." Sixth Circuit 06/17/10 Order at 3. The panel therefore granted Saieg's motion for an injunction pending appeal, permitting Saieg "to distribute his religious literature in the streets contained within . . . the 'outer perimeter' or 'buffer zone,'" but not "within the Festival itself." *Id.* That order expired after the 2010 Festival. *Id.* The 16th annual Festival will be held June 17–19, 2011. *Arab International Festival*, www.americanarab.com/events-a-programs/business-development.html.

## II.  DISCUSSION

### A.  Standard of Review

When a district court denies a permanent injunction, we review the court's legal conclusions de novo, its factual findings for clear error, and the scope of the injunction for abuse of discretion.  *Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004), *cert. denied*, 546 U.S. 813 (2005).  "A party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer continuing irreparable injury for which there is no adequate remedy at law." *Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010) (internal quotation marks omitted), *cert. denied*, 131 S. Ct. 1007 (2011).

The district court granted the defendants summary judgment on the first point—whether Saieg suffered a constitutional violation.  That is a legal question, so the standard of review coincides with the de novo standard that we apply to summary judgments generally.  *Id.*  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "We review cross motions for summary judgment under this standard as well, evaluating each motion on its own merits."  *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

### B.  Free Speech

Following the Supreme Court's guidance in *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 797 (1985), we analyze free speech claims in three steps.  *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005).  The first step is to determine whether the plaintiff's conduct is protected speech.  *Id.*  Saieg's conduct is clearly protected.  "'[T]he hand distribution of religious tracts is an age-old form of missionary evangelism,' *Murdock v. Pennsylvania*, 319 U.S. 105, 108 (1943), and such activity 'has the same claim as [oral and written dissemination] to the guarantee[] of freedom of speech . . . ,' *id.* at 109."  *Parks*, 395 F.3d at 647.

The second step is to "'identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic.'" *Id.* (quoting *Cornelius*, 473 U.S. at 797). Public streets and sidewalks "are 'quintessential' public forums for free speech," *Hill v. Colorado*, 530 U.S. 703, 715 (2000); *see also Frisby v. Schultz*, 487 U.S. 474, 480–81 (1988), although "there have been limited circumstances where public streets or sidewalks are not considered public fora," *Parks*, 395 F.3d at 648 (mentioning sidewalks by post offices and sidewalks in military reservations). Restrictions on speech in traditional public fora must either be (1) reasonable time, place, and manner regulations or (2) "narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace*, 461 U.S. 171, 177 (1983). In general, then, "the government's ability to permissibly restrict expressive conduct" on public streets and sidewalks "is very limited." *Id.*

The parties disagree about whether the streets and sidewalks within the inner and outer perimeters were functioning as traditional public fora or limited public fora[2] during the Festival. *Compare Parks*, 395 F.3d at 652 (holding that "the streets remained a traditional public forum notwithstanding the special[, non-exclusive] permit" that allowed a private group to operate a public Arts Festival on public streets), *with Spingola*, 39 F. App'x at 983 (holding that the "public streets" were "not serving in th[eir traditional] function during the festival"); *see also Heffron*, 452 U.S. at 651 (explaining that the Minnesota Fair, which is "a temporary event attracting great numbers of visitors," presents problems of traffic flow and crowd control that make "any comparisons to public streets . . . necessarily inexact"). This disagreement, however, is not germane to the free speech issue in this case. If a rule is "content-neutral, [then] the appropriate test is intermediate scrutiny," even when the rule governs speech in a traditional public forum. *Phelps-Roper v. Strickland*, 539 F.3d 356, 361–62 (6th Cir. 2008); *see also Spingola*, 39 F. App'x at 983 ("[R]egardless of whether we would classify the . . . festival area as a traditional public forum or a limited public forum . . . ,

---

[2]"The government may restrict speech in a limited public forum as long as the restrictions do 'not discriminate against speech on the basis of viewpoint' and are 'reasonable in light of the purpose served by the forum.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 535 (6th Cir. 2010) (quoting *Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106–07 (2001)).

the Ordinance is examined under the same intermediate level of scrutiny.").  As explained below, the leafleting restriction is content neutral.

Therefore, it is the third step that decides this case:  "whether the justifications for exclusion from the relevant forum satisfy the requisite standard."  *Cornelius*, 473 U.S. at 797.  The requisite principle applicable to this case is that "[t]ime, place, and manner restrictions may be enforced even in a *traditional public forum* so long as they are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841, 850 (6th Cir. 2008).  The leafleting restriction does not satisfy this standard.

### 1.  Content Neutrality

The leafleting restriction is content neutral.  Whether a restriction on speech is content neutral has substantial bearing on the constitutionality of the restriction because "the government is held to a very exacting and rarely satisfied standard when it disfavors the discussion of particular subjects or particular viewpoints within a given subject matter."  *Hill*, 530 U.S. at 735 (Souter, J., concurring) (internal citations omitted).  Government regulations of speech are content neutral if they are "justified without reference to the content or viewpoint of the regulated speech."  *Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, --- U.S. ---, 130 S. Ct. 2971, 2994 (2010) (internal alterations and quotation marks omitted); *see also Hill*, 530 U.S. at 719 ("'The principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))).  "The government's purpose is the controlling consideration."  *Ward*, 491 U.S. at 791.  "[D]ifferential impact" without more does not demonstrate that a regulation is content based.  *Christian Legal Soc'y*, 130 S. Ct. at 2994.

Requiring that all literature be distributed from a stationary location is a content-neutral regulation.  Designating "specific areas for specific things" at the Festival, R. 47-3 (Ex. C:  Beydoun dep. at 33), "is not a 'regulation of speech.'  Rather, it is a regulation

of the places where some speech may occur." *Hill*, 530 U.S. at 719. Supporting this conclusion is the fact that "the State's interests" in crowd control and public safety "are unrelated to the content of [the regulated] speech." *Id.* at 719–20. In addition, Saieg has not produced evidence that the regulation was "adopted 'because of disagreement with the message [that his speech] conveys.'" *Id.* at 719 (quoting *Ward*, 491 U.S. at 791).

Saieg argues that the leafleting restriction is content based because it privileges commercial speech over noncommercial speech. He points to the City's practice of letting Warren Avenue storefronts erect sidewalk tables, whereas he cannot distribute materials from the same sidewalk. This argument misapprehends the criterion for who can vend from the sidewalk. The criterion is location, not content or type (commercial or noncommercial) of speech. Any entity with a storefront on Warren Avenue can set up sidewalk table, and no one without a storefront can become a sidewalk vendor. R. 47-3 (Ex. C: Beydoun Dep. at 64–65). The defendants do not inquire into whether the sidewalk vendor is commercial or noncommercial, and the defendants do not screen the messages that sidewalk tables convey for content.

The AACC's proposal for the 2009 Festival confirms that location of the speakers, not the content of their speech, is the criterion for permitting sidewalk sales. The AACC describes "sidewalk sales . . . by merchants on Warren Ave[nue]" as a component of the Festival, alongside the "main stage, children's tent, vendor tents, artisan's tents," "carnival," and "[f]ood and entertainment." R. 47-5 (Ex. E: Request from AACC at 1). Moreover, the 2009 proposal names "promot[ing] the Warren Avenue Business District" as one of two objectives for the Festival. R. 47-5 (Ex. E: Request from AACC at 3). As a way of promoting the Warren Avenue Business District, the sidewalk tables offer a "quid pro quo for stores negatively impacted by the Festival. In exchange for subjecting them to Festival crowds in front of their stores and closed-off streets that block regular customers' ingress and egress, the existing merchants are permitted to set up tables out front to sell their wares." 720 F. Supp. 2d at 837.

In sum, the leafleting restriction does not use location as a guise for the content of speech. Neither the leafleting restriction nor the interest that the defendants seek to promote are related to the content of the restricted speech. The restriction, then, is content neutral.

### 2. Substantial Governmental Interest

The leafleting restriction does not further a substantial governmental interest. Time, place, and manner regulations must "'promote[] a substantial government interest that would be achieved less effectively absent the regulation.'" *Ward*, 491 U.S. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). "'The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests' or the degree to which those interests should be promoted." *Id.* at 800 (quoting *Albertini*, 472 U.S. at 689) (internal alteration marks removed).

The defendants have named several interests that they find significant: relieving "pedestrian overcrowding," enhancing "traffic flow," minimizing "threats to public safety," and limiting "disorderliness at the Festival." Appellee Br. at 37. In appropriate contexts, each of these governmental interests can be substantial. In fact, the interests that the defendants have identified closely parallel the interests that the Supreme Court validated in *Heffron*. In *Heffron*, Minnesota imposed leafleting restrictions at the state fair because the state was concerned with "maintain[ing] the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair." 452 U.S. at 649–50. The Supreme Court held that "the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest." *Id.* at 654; *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994) (recognizing the state's "strong interest in ensuring the public safety and order" and "in promoting the free flow of traffic on public streets and sidewalks").

The defendants must do more, however, than "assert[] interests [that] are important in the abstract." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994).

In the context of the Festival's inner perimeter, the interests that the defendants have named are merely "conjectural," as opposed to "real." *Id.* Two activities that Festival organizers permit on sidewalks abutting Warren Avenue erode the significance of the government's interest in restricting leafleting on those same sidewalks. These activities are legally relevant because "[e]xemptions from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the . . . rationale for restricting speech in the first place." *City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

First, Festival organizers keep sidewalks that are adjacent to Warren Avenue open for public traffic. In *Heffron*, attendees paid an admission fee to enter the fairgrounds, 452 U.S. at 658 (Brennan, J., dissenting), which means that the fairgrounds were closed to members of the public who were not attending the fair. In fact, the Supreme Court expressly distinguished the fairgrounds in *Heffron* from a public street. 452 U.S. at 651. In contrast, Festival organizers have intentionally maintained the public character of the sidewalks that are adjacent to the Festival attractions, keeping those sidewalks open for traffic that is unrelated to the Festival. R. 47-3 (Ex. C: Beydoun Dep. at 37) ("We wanted to make sure that the sidewalks [a]re available, whether it's for the people attending the [F]estival or people [who a]re trying to get from one location to another to go to the businesses."). The sidewalks may well host more traffic during the Festival than they do on other days of the year. Nevertheless, the defendants have chosen to keep the sidewalks open for public use, showing that the interests in crowd control and public safety are not so pressing that they justify restricting normal activity that occurs on streets and sidewalks. Therefore, because Festival organizers permit public traffic on the sidewalks next to Warren Avenue, the interest in curtailing First Amendment expression on those sidewalks is not substantial.[3]

Second and more importantly, Festival organizers permit sidewalk vendors on the sidewalks that are adjacent to Warren Avenue, belying the significance of their interest in clear sidewalks and crowd control. The sidewalk vendors have no analog in

---

[3]The district court rejected this argument because *Spingola* applied *Heffron* to a two-block fair on public streets. However, *Spingola* was an unpublished opinion that did not analyze the issue. To the extent that *Spingola*'s holding runs counter to our analysis, we do not find *Spingola* persuasive.

the facts of *Heffron*, where the fair "confin[ed] individual exhibitors to fixed locations, with the public moving to and among the booths or other attractions, using streets and open spaces provided for that purpose." 452 U.S. at 650. Leafleting is less obtrusive than sidewalk tables are because "'[t]he distribution of literature does not require that the recipient stop in order to receive the message the speaker wishes to convey; instead the recipient is free to read the message at a later time.'" *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 690 (1992) (O'Connor, J., concurring) (quoting *United States v. Kokinda*, 497 U.S. 720, 734 (1990)). The defendants admitted at oral argument that leafleters have never posed any problems of public safety or breach of the peace at the Festival that could make leafleters more obtrusive than sidewalk vendors. By permitting the more obstructive sidewalk tables in the same place where Saieg wishes to leaflet by foot, the defendants have undercut the credibility of the asserted government interests.[4]

The defendants respond than an interest can be substantial even if the state does not promote it in every conceivable way. A restriction on speech can satisfy the time, place, and manner test if the restriction "promotes a substantial government interest that would be achieved *less effectively* absent the regulation." *Ward*, 491 U.S. at 799 (internal quotation marks omitted; emphasis added). This statement of the law is drawn from the requirement of narrow tailoring. Immediately after the quoted language, *Ward* clarifies that, "[t]o be sure, this standard [for narrow tailoring] does not mean that a time, place, or manner regulation may burden substantially *more* speech than is necessary to further the government's legitimate interests." *Id.* (emphasis added). By analogy, even when a regulation promotes a government interest that would be achieved less effectively absent the regulation, the government's interest may still be insubstantial if the regulation burdens substantially *less* speech than is necessary to further the

---

[4]The district court's response to Saieg's argument is not persuasive. According to the district court, the Sixth Circuit rejected an argument similar to Saieg's in *Spingola*. In *Spingola*, the plaintiff "argue[d] that the regulation does not relieve the crowding and pedestrian flow obstructions that take place during the festival regardless." 39 F. App'x at 984. Saieg's argument goes further than saying that the regulation is not a panacea for crowd control. Saieg claims that the defendants permit one activity that seriously harms the government's supposed interest at the same time that they ban another activity that only mildly harms that same supposed interest.

government's interest. *See City of Ladue*, 512 U.S. at 51 ("[T]he notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles."); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489 (1995) (holding that a policy violates the First Amendment because "exemptions and inconsistencies bring into question the purpose" of the policy, even though "the Government's interest . . . remains a valid goal"); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (holding that "the facial underinclusiveness" of the state's restriction on speech "raises serious doubts about whether Florida is, in fact, serving . . . the significant interests [that it has] invoke[d] in support" of the policy). In this case, the nature and scale of the activities that the defendants permit on the sidewalks adjacent to Warren Avenue show that the government's asserted interests are not substantial in the context of those sidewalks.

With regard to the outer perimeter, the roads and sidewalks are open for pedestrians in the same way as the sidewalks that are adjacent to Warren Avenue. Concerns about crowd control seem to be exclusively conjectural. However, Saieg focuses his argument about the outer perimeter on the question of narrow tailoring. We follow his lead and address the outer perimeter below.

### 3. Narrow Tailoring

The leafleting restriction within the outer perimeter is not narrowly tailored to further the government's objectives. To be narrowly tailored, a regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Put differently, the regulation must not be "substantially broader than necessary." *Id.* at 800. "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the [state's] goal." *Hill*, 530 U.S. at 726.

The parties disagree about whether the sidewalks adjacent to the Festival and the streets and sidewalks within the outer perimeter area are "part of" the Festival. Consequently, the parties also disagree about whether Saieg seeks to participate *in* the

Festival or to leaflet *near* the Festival, a distinction that informs their arguments about narrow tailoring. This debate is a red herring. The narrow-tailoring requirement focuses on the nexus between the regulation and the government's interest. *Grace*, 461 U.S. at 181. The government's interests need not be coterminous with "the Festival" as a monolithic area, and the government may have different interests in different areas of the Festival or near the Festival. As a result, whether these locations are classified as part of "the Festival" does not determine whether the leafleting restriction is narrowly tailored to accomplish the government's interests.

Saieg has not requested to leaflet *on* Warren Avenue. Moreover, Saieg has not disputed that the restriction on leafleting within the *inner* perimeter—the sidewalks adjacent to Warren Avenue—is narrowly tailored. *Saieg*, 720 F. Supp. 2d at 839 ("Plaintiff does not mount a 'narrow tailoring' challenge with respect to the enforcement of the handbilling ban in the inner perimeter."). As explained above, we agree with Saieg that the inner-perimeter restriction on leafleting does not further a substantial government interest, making the question of narrow tailoring irrelevant.

The restriction on leafleting within the *outer* perimeter is substantially broader than necessary to further the government's interests, assuming that those interests are substantial. In reaching the opposite conclusion, the district court and the defendants correctly analyze the issue from the perspective of permitting everyone to leaflet, not only Saieg. *See Heffron*, 452 U.S. at 653 ("Obviously, there would be a much larger threat to the State's interest in crowd control if all other religious, nonreligious, and noncommercial organizations could likewise move freely about the fairgrounds distributing and selling literature and soliciting funds at will."). The district court, however, used that perspective to magnify an unsubstantiated fear. "[M]ere speculation about danger" is not an adequate basis on which to justify a restriction of speech. *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990); *see also Turner Broad. Sys., Inc.*, 512 U.S. at 664 (requiring that the government "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way"). Although the government has an

interest in crowd control, the defendants "must do more than simply posit the existence of the disease sought to be cured." *Turner Broad. Sys., Inc.*, 512 U.S. at 664 (internal quotation marks omitted); *see also Klein v. City of San Clemente*, 584 F.3d 1196, 1202 (9th Cir. 2009) ("[M]erely invoking interests is insufficient. The government must also show that the proposed communicative activity endangers those interests." (internal alteration marks and quotation marks omitted)), *cert. denied*, 130 S. Ct. 1706 (2010). The district court neglected these principles by concluding that throngs of people "would all flock to the outer perimeter to promote their respective interests and messages," thereby "extend[ing] the Festival grounds into an area that is meant to serve as a buffer zone between the Festival and the outside world." *Saieg*, 720 F. Supp. 2d at 840. The weakness in the district court's argument is that the primary justification for the outer perimeter is to curb vehicular traffic and provide parking, not to cabin pedestrian crowds. Despite the district court's speculation, the record does not mention any existing problem of pedestrian traffic in the outer perimeter area. Saieg leaflets by foot. While his leafleting might attract pedestrian listeners who would congregate on the sidewalks, it is hard to imagine that leafleters, who would be competing with more interesting attractions on Warren Avenue, could draw crowds so large that the Festival would balloon outward. Attracting merely a few listeners on a sidewalk would not implicate a substantial governmental interest in crowd control.

Beydoun's testimony mirrors the hyperbole of the district court: "if you allowed someone to distribute literature within [the] outer area, you might as well allow the other street vendors to set up tables and start selling things in that area, too. That is the buffer between going in and going out. You [have] got to maintain a security area." R. 47-3 (Ex. C: Beydoun Dep. at 58). Beydoun's worry is exaggerated. Although "[t]he justification for the [challenged rule] should not be measured by the disorder that would result from granting an exemption solely to" the challenging party, *Heffron*, 452 U.S. at 652, permitting everyone to leaflet in the outer perimeter area does not require the city to permit street vending or other attractions in the area defined by the outer perimeter. Instead, by invalidating the leafleting restriction, we hold only that the defendants must

permit speech—including, but not limited to, archetypal First Amendment activity such as distributing leaflets, books, or DVDs.

The restriction on *pedestrian* leafleting is substantially broader than necessary to further the interest in *vehicular* traffic control and parking. In other words, the restriction is not narrowly tailored because there is "an insufficient nexus" between the government's asserted interest and the leafleting restriction. *Grace*, 461 U.S. at 181.

### 4. Ample Alternative Channels of Communication

We do not decide whether the restriction on leafleting leaves Saieg with ample alternative methods of communicating to his target audience. Any time, place, and manner restriction must leave open ample alternative channels by which speakers can communicate their messages, although speakers are "not entitled to [their] best means of communication." *Phelps-Roper*, 539 F.3d at 372. "An alternative is not ample if the speaker is not permitted to reach the intended audience." *Bay Area Peace Navy*, 914 F.2d at 1229 (internal quotation marks omitted). The requirements for a time, place, and manner restriction are conjunctive. *See, e.g.*, *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 168–69 (2002) (invalidating an ordinance that served a substantial government interest because it was not narrowly tailored—without discussing whether ample alternative channels of communication existed). Thus, the leafleting restriction is unconstitutional even if it leaves open ample alternative channels of communication.

### 5. Summary

Even though the leafleting restriction is content neutral and might provide ample alternative means of communication, the policy is not a reasonable time, place, and manner restriction. Within the inner perimeter, the restriction does not serve a substantial governmental interest, as evidenced by the defendants' willingness to permit sidewalk vendors and ordinary pedestrian traffic on the same sidewalks where they prohibited Saieg from leafleting. Within the outer perimeter area, the restriction is not

narrowly tailored because the government's interest in vehicular traffic control is attenuated from concern about pedestrian crowds that pedestrian leafleting might draw.[5]

Saieg has requested, in the event that this court rules in his favor, "that the decision be crafted to prevent Defendants from circumventing it by playing a game of shifting 'perimeters.'"  Reply Br. at 1 n.1.  Our holding is not predicated on the boundaries of the Festival or a distinction between the inner and outer perimeters.  Saieg and other members of the public may leaflet from any street or sidewalk that remains open for typical, non-Festival pedestrian traffic, even if the street or sidewalk is simultaneously used for Festival traffic.  We note that, should the City's conjectural harms come to pass, the City can move to modify the injunction.  *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 466 F.3d 391, 395 (6th Cir. 2006), *cert. denied*, 549 U.S. 1339 (2007).

In addition to declarative and injunctive relief, Saieg is entitled to nominal damages for the violation of his constitutional rights.  *See Carey v. Piphus*, 435 U.S. 247, 266 (1978).

## C.  Freedom of Association

Saieg's freedom-of-association claim lacks merit.  The freedom to associate protects "choices to enter into and maintain certain intimate human relationships" as well as "associat[ion] for the purpose of engaging in those activities protected by the First Amendment."  *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18 (1984).  Unless they promote compelling state interests, government actions violate the freedom of association when, for example, they "seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group; . . . attempt to require disclosure of the fact of membership in a group seeking anonymity; . . . [or] try to interfere with the internal organization or affairs of the group."  *Id.* at 622–23 (internal

---

[5]Although Saieg has sought to leaflet on the sidewalks adjacent to Warren Avenue and Miller Road, he has repeatedly declined to request permission to leaflet on those streets themselves.  Appellant Br. at 2.  Because Saieg has not raised the issue, we have no occasion to decide whether Saieg may leaflet on those streets.

citations omitted).   Even though Saieg has been deprived of one outlet for his association's expression, his freedom to associate has not been abridged in any way comparable to these examples.  Saieg is free to associate even at the Festival.  Only leafleting, not association, has been restricted.

## D.  Free Exercise of Religion

Saieg abandoned his free exercise claim before the district court.  720 F. Supp. 2d at 841.  He has not contested the waiver on appeal.  Therefore, his free exercise claim is not one that we must consider.  *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007), *cert. denied*, 129 S. Ct. 287 (2008).

## E.  Equal Protection

The leafleting restriction does not violate the Equal Protection Clause.  Saieg argues that the leafleting restriction distinguishes by content between religious leaflets and commercial sidewalk tables.  He relies on *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972), which held that "[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone."  Unlike the restriction in *Mosley*, however, the restriction in this case does not "describe[] permissible [speech] in terms of its subject matter."  *Id.* at 95. Instead, sidewalk tables are permissible according to the *location* of the organization that operates them, not the subject matter of the message that the organization conveys.  *See supra* Section II.B.1.  Therefore, the restriction does not violate the Equal Protection Clause.

## F.  City's Liability

The City may be held liable for the restriction of Saieg's free speech rights that the leafleting restriction caused.  A municipality is liable if a constitutional injury results from a policy or custom "made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).  In this case, the City approved the Festival "subject to . . . the rules and regulations of the Police Department."  R. 47-13 (Ex. M:  Council Resolution).

Although the AACC also wanted to prohibit leafleting, Chief Haddad described the leafleting policy as his department's policy, subject only to the approval of the city council and the mayor. R. 47-11 (Ex. K: Haddad Dep. at 95–96) (stating that "the police department will supply the standards that must be met," such as the "prohibition of individuals handing out . . . materials on the public sidewalk"). The police department's leafleting policy, made with the authority that the City Council delegated to it, fairly represents official City policy. Therefore, Saieg may hold the City liable for violating his First Amendment right to free speech.

However, the City is not liable for claims of selective enforcement. Because the argument portion of Saieg's appellate brief does not identify or provide citations for any instances of selective enforcement, Saieg has waived the claim. Even considering the merits of Saieg's claim, the district court properly found that the incidents of supposedly selective enforcement were not "so widespread as to have the force of law," *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403–04 (1997), and are not actions ascribable to Chief Haddad as opposed to individual officers. 720 F. Supp. 2d at 844.

### III. CONCLUSION

The leafleting restriction is not a reasonable time, place, and manner restriction. In the inner perimeter, the restriction does not serve a substantial governmental interest. In the outer perimeter, the restriction is not narrowly tailored. The defendants therefore violated Saieg's First Amendment right to freedom of speech. Absent an injunction, Saieg will continue to suffer irreparable injury for which there is no adequate remedy at law. As a result, on the free-speech claim, we **REVERSE** both the district court's grant of summary judgment to the defendants and its denial of summary judgment to the plaintiffs. We **AFFIRM** the district court's judgment for the defendants on all other claims. We **REMAND** to the district court for such further proceedings as are consistent with this opinion that may be warranted, including the entry of such injunctive relief in favor of Saieg as may be appropriate in advance of the Festival scheduled for June 17-19, 2011.

_____

**DISSENT**

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge, dissenting.  In contrast to the majority here, I am persuaded that the restrictions on leafleting imposed during the Arab International Festival did not violate the plaintiff's First Amendment right to free speech. Those restrictions constituted a reasonable time, place, and manner limitation in service of a substantial government interest, and they were sufficiently narrowly tailored to further that substantial interest, as the district court held in a thoughtful and well-documented opinion granting summary judgment to the City of Dearborn and its Chief of Police.  While I would normally set out an analysis to support this conclusion, there is no reason to delay issuance of the majority's order in this expedited appeal, given that the district court has provided a masterful explanation for judgment in the defendants' favor.  I therefore dissent for reasons set out in the district court's opinion and order filed on June 7, 2010.