RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0208p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BIBLE BELIEVERS; RUBEN CHAVEZ, aka Ruben Israel; ARTHUR FISHER; JOSHUA DELOSSANTOS,

　　　　　*Plaintiffs-Appellants*,

　v.

WAYNE COUNTY; BENNY N. NAPOLEON, in his official capacity as Sheriff, Wayne County Sheriff's Office; DENNIS RICHARDSON, individually and in his official capacity as Deputy Chief, Wayne County Sheriff's Office; MIKE JAAFAR, individually and in his official capacity as Deputy Chief, Wayne County Sheriff's Office,

　　　　　*Defendants-Appellees*.

No. 13-1635

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cv-14236—Patrick J. Duggan, District Judge.

Argued: January 21, 2014

Decided and Filed: August 27, 2014

Before: CLAY and DONALD, Circuit Judges; MAYS, District Judge.*

---

**COUNSEL**

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellants. Nabih H. Ayad, NABIH H. AYAD & ASSOCIATES, P.C., Canton, Michigan, for Appellees. **ON BRIEF:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, AMERICAN FREEDOM LAW CENTER,

---

*The Honorable Samuel H. Mays, Jr., United States District Court for the Western District of Tennessee, sitting by designation.

1

Washington, D.C., for Appellants.  Nabih H. Ayad, NABIH H. AYAD & ASSOCIATES, P.C., Canton, Michigan, for Appellees.

DONALD, J., delivered the opinion of the court, in which MAYS, D.J., joined.  CLAY, J. (pp. 18–29), delivered a separate dissenting opinion.

_____

**OPINION**

_____

BERNICE BOUIE DONALD, Circuit Judge.  This appeal requires us to "grapple[] with claims of the right to disseminate ideas in public places as against claims of an effective power in government to keep the peace[.]"  *Niemotko v. Maryland*, 340 U.S. 268, 273-74 (1951) (Frankfurter, J., concurring).  Plaintiffs-Appellants Bible Believers, Ruben Chavez, Arthur Fisher, and Joshua DeLosSantos appeal the district court's grant of summary judgment in favor of Defendants-Appellees Wayne County, Michigan; Wayne County Sheriff Benny Napoleon; and Wayne County Deputy Chiefs Dennis Richardson and Mike Jaafar.  Appellants claim that Appellees violated their First Amendment rights to free speech and free exercise of religion and the Fourteenth Amendment's Equal Protection Clause.  All of these claims arise out of events at the 2012 Arab International Festival in Dearborn, Michigan, where Appellants' proselytizing led an angry crowd to heave debris at Appellants; this reaction caused Appellees Jaafar and Richardson to warn Appellants that they would issue disorderly conduct citations to Appellants if they did not leave.  The district court held that Appellees did not violate Appellants' First Amendment free-speech and free-exercise rights and did not violate the Fourteenth Amendment's Equal Protection Clause.  Because it did not find any constitutional violations, the district court did not address qualified immunity.  It did offer an alternate holding that, even if Appellants' rights had been violated, Wayne County would not be subject to municipal liability.  For the reasons explained below, we **AFFIRM**.

I.

The City of Dearborn in Wayne County, Michigan, has hosted the Arab International Festival ("Festival") every summer from 1995 until 2012.  A three-day event that was free and open to the public, the Festival welcomed roughly 250,000 attendees and featured carnival

attractions, live entertainment, international food, and merchandise sales. *See Saieg v. City of Dearborn*, 641 F.3d 727, 730 (6th Cir. 2011). The 2012 Festival had eighty-five vendors, information tables, and sponsor booths—several of which were affiliated with various Christian and other religious groups. Over the years, Christian evangelists have targeted the Festival. *See Saieg*, 641 F.3d at 731-32.

Bible Believers, which is comprised of Christian evangelists, is, in their own words, "an unincorporated association of individuals who desire to share and express their Christian faith with others, including Muslims, through various activities, including street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes." Ruben Chavez is a founder and leader of Bible Believers; Joshua DeLosSantos and Arthur Fisher are members. To Appellants, Dearborn "is an important place for [their] evangelical activities" because of its large Islamic population.

Appellants attended two days of the 2011 Festival, bearing "Christian signs, banners, and t-shirts." On the first day, officers from the Wayne County Sheriff's Office ("WCSO") steered them into a cordoned off "free speech zone." There was no free speech zone when they returned on the second day, so Appellants moved through the crowd. This allegedly peaceful proselytizing sparked confrontation with bystanders, which ended with the arrest of one Bible Believer, who was later released without charge. This arrest provided part of the impetus for Appellants' return to the Festival in 2012.

During the build-up to the 2012 Festival, Chavez's attorney wrote a letter to Wayne County Sheriff Benny Napoleon and Robert Fianco, the Wayne County Executive, to notify them that Chavez intended to exercise his constitutional rights at the 2012 Festival. This letter also alleged that the WCSO sided with "the violent Muslims" during the 2011 Festival and then cited *Glasson v. City of Louisville*, 518 F.2d 899, 906 (6th Cir. 1975), to assert that "officers have a duty to protect speakers like [Chavez] from the reactions of hostile audiences. If the officers allow a hostile audience to silence a speaker, the officers themselves effectively silence the speaker and effectuate a 'heckler's veto.'" The letter concludes: "We fully expect and demand Wayne County Sheriff's Department to protect [Chavez] and his friends from physical assaults and allow [Chavez] and his friends to engage in their peaceful expression."

Zenna Elhasan, Wayne County's Corporation Counsel, responded on June 14, 2012. After disputing Chavez's characterization of the 2011 events, Elhasan repudiated any inference of a "special relationship" with Chavez: "The WCSO owes a duty to the public as a whole and is not required to serve as a security force for the sole benefit of [Chavez] and the 'Bible Believers.'" Elhasan further advised that the WCSO cannot prevent all unlawful conduct and that "under state and local ordinances, individuals can be held criminally accountable for conduct which has the tendency to incite riotous behavior or otherwise disturb the peace." Elhasan concluded:

> Wayne County has great reverence for the First Amendment, but it cannot protect everyone from the foreseeable consequences that come from speech that is designed and perhaps intended to elicit a potentially negative reaction. The WCSO will not restrict the First Amendment Rights of any individual, but, by following the laws requiring the observance of such rights, the WCSO neither cedes its right to maintain the peace nor assumes unto itself liability for the illegal conduct of others.

The 2012 Festival ran from June 15 through June 17 along several blocks of Warren Avenue in Dearborn; the WCSO was the Festival's exclusive law enforcement agency. According to the WCSO, it allocated more personnel to the Festival than to "the World Series or the President of the United States when he visits Michigan." Deputy Chief Mike Jaafar wrote the WCSO's Operation Plan ("Plan") for the Festival. The Plan explained the WCSO's overall mission to provide "Wayne County citizens, festival patrons, organizers, [and] merchants with law enforcement presence and to ensure the safety of the public, and keep the peace in the event there is a disturbance." The Plan noted that past festivals had attracted Christian evangelical groups, including "a radical group calling themselves 'The Bible Believers' . . . . These groups will possibly show up at the festival trying to provoke our staff in a negative manner and attempt to capture the negativity on video camera." The plan emphasized that "**[i]t's important to keep in mind that some individuals will attend this event solely to provoke trouble, however; professionalism, and even temperaments will prevail**."

Appellants arrived at the Festival around 5:00 p.m. on June 15, 2012; they entered at the western end, "near the area used for the children's tent and the carnival rides."[1]  As in 2011, the Bible Believers came bearing strongly worded t-shirts and banners:

> [Chavez] wore a t-shirt with the message, "Fear God" on the front and "Trust Jesus, Repent and Believe in Jesus" on the back.  Fisher wore a t-shirt with the message, "Trust Jesus" on the front and "Fear God and Give Him Glory" on the back, and he carried a banner that said on one side, "Only Jesus Christ Can Save You From Sin and Hell," and on the other side it said, "Jesus Is the Judge, Therefore, Repent, Be Converted That Your Sins May Be Blotted Out."  Other messages conveyed on t-shirts, signs, or banners displayed by the [other Bible Believers] included, among others, "Fear God," "Trust Jesus, Repent and Believe in Jesus," "Prepare to Meet Thy God - Amos 4:12," "Obey God, Repent," "Turn or Burn," "Jesus Is the Way, the Truth and the Life.  All Others Are Thieves and Robbers," and "Islam Is A Religion of Blood and Murder."

One Bible Believer carried a severed pig's head on a stick, which Chavez explained protected the Bible Believers by repelling observers who feared it.  Appellants soon began preaching using a megaphone, and a small crowd formed around them almost immediately.  Chavez castigated the crowd for following a "pedophile" prophet and warned of God's impending judgment.  As this evangelizing continued, the crowd yelled back.  At this point, a ribbon-cutting at the opposite end of the Festival occupied a majority of the WSCO officers, but one officer watched from the outskirts of the crowd.

After roughly ten minutes, unidentified people started separating other Festival-goers from the Bible Believers, and the crowd temporarily thinned.  About fifteen minutes after the Bible Believers entered the Festival, an officer approached them, told Chavez that Dearborn had an ordinance prohibiting the use of a megaphone, and warned the Bible Believers not to use it anymore.  Chavez explained that they had used a megaphone without issue in 2011 and asked, "If we don't use the megaphones, can they throw water bottles?  What are you going to do if they throw water bottles at us?"  The officer responded, "If that happens, we'll take care of it."  Chavez continued grumbling about the megaphone, and the officer said he would call a supervisor.  After the officer departed, however, Appellants did not use the megaphone again.

---

[1]Most of the facts about the events at the 2012 Festival itself are based on raw video footage filmed by one Bible Believer.

As the Bible Believers moved deeper into the Festival, the crowd—a good portion of which appeared to be minors—continued to gather and yell. Some people started throwing debris—including rocks, plastic bottles, garbage, and a milk crate—at the Bible Believers. Someone in the crowd also shoved one Bible Believer to the ground. Some WCSO officers detained debris-throwers while other officers hovered at the edges of the crowd. Eventually, after about thirty-five minutes, the Bible Believers temporarily stopped preaching and stood as the crowd harangued them and hurled objects. Several officers, including some mounted units, attempted to quell the crowd.

After about five minutes of standing quietly, the Bible Believers began to move and preach again. As they did so, the cascade of objects intensified. Deputy Chiefs Richardson and Jaafar approached them a few minutes later. Jaafar explained that they could leave and that their safety was in jeopardy because not enough officers were available to control the crowd. The Bible Believers, however, continued to preach, followed by what had swelled into a large crowd.

Richardson and Jaafar then took Chavez aside to speak with him. Richardson noted his concern that Chavez was bleeding from where a piece of debris had cut his face. Richardson explained that he was responsible for policing the entire Festival, that Chavez's conduct was inciting the crowd, and that he would escort the Bible Believers out of the Festival. Jaafar then told Chavez that the WCSO had been respectful but that the Bible Believers were affecting public safety. Richardson said, "Apparently, what you are saying to [the crowd], and they are saying back to you is creating danger." Richardson reiterated that he did not have enough officers to assign a detail to protect the Bible Believers. Members of Bible Believers requested that they be moved into a protected area, but Richardson explained that the local chamber of commerce had opted not to have a free speech zone at the 2012 Festival.

As Richardson insisted that the Bible Believers leave lest someone—a Bible Believer, a Festival goer, or an officer—be injured, Chavez asked if they would be arrested if they refused; Richardson replied, "Probably we will cite you." This conversation replayed several times, with Chavez pressing for an answer and Richardson replying that the Bible Believers were a danger to public safety. Chavez eventually snapped, "I would assume a few hundred angry Muslim children throwing bottles would be more of a threat than a few guys with signs." Richardson

stepped away briefly to confer with the Director of Legal Affairs for the WCSO and then told Chavez, "You need to leave.  If you don't leave, we're going to cite you for disorderly.  You're creating a disturbance.  I mean, look at your people here.  This is crazy!"  Officers then escorted the Bible Believers out.  Overall, the Bible Believers preached at the Festival less than one hour. The WCSO's Post-Operation Report indicated that officers arrested and cited several people for disorderly conduct and gave others verbal warnings.

No Bible Believers were cited or arrested at the 2012 Festival itself.  Moments after Bible Believers' van pulled away, however, a WCSO squad car stopped it. Several cars and multiple officers observed as the van's driver received a citation for driving without license plates.  One Bible Believer said they had removed the license plate because they anticipated being followed from the Festival to their church.

## II.

Appellants filed suit in the United States District Court for the Eastern District of Michigan, bringing three claims under 42 U.S.C. § 1983: (1) violations of their First Amendment right to free speech; (2) violations of their First Amendment right to free exercise of religion; and (3) violations of the Equal Protection Clause of the Fourteenth Amendment.  Appellants sought declaratory relief, injunctive relief, "nominal damages," and attorneys' fees.  Appellees answered and filed a motion for summary judgment or, in the alternative, to dismiss, arguing that the individual Appellees were entitled to qualified immunity, that Wayne County was not subject to municipal liability under *Monell v. New York Department of Social Services*, 436 U.S. 659 (1978), and that the restrictions on Appellants' speech were content neutral and thus permissible. Appellants opposed this motion, filed a cross-motion for summary judgment, and filed a motion for a preliminary injunction.  After a hearing on these motions, the district court granted Appellees' motion, which it construed as one for summary judgment, denied Appellants' cross-motion for summary judgment, and denied Appellants' motion for a preliminary injunction as moot.  This appeal ensued.

III.

We review de novo a district court's grant of summary judgment using the *Matsushita-Anderson-Celotex* standard. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We view facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). We do not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which it must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party may not "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing Fed. R. Civ. P. 56; *Matsushita*, 475 U.S. at 586). A party asserting a genuine issue of material fact must support this argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson*, 477 U.S. at 248-52. If there are no disputed, material facts, we review de novo whether the district court properly applied the substantive law. *Farhat v. Jopke*, 370 F.3d 580, 588 (6th Cir. 2003).

IV.

Appellants assert that Appellees violated their First Amendment right to freedom of speech by either suppressing their speech ab initio or by permitting the hostile mob to effectuate a so-called "heckler's veto."

A.

We employ a three-step process to analyze First Amendment free-speech claims. *E.g.,* *Saieg v. City of Dearborn*, 641 F.3d 727, 734 (6th Cir. 2011) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 797 (1985)); *Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005). "The first step is to determine whether the plaintiff's conduct is protected speech . . . . The second step is to identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Saieg*, 641 F.3d at 734 (internal quotation marks omitted). In the third step, we decide "'whether the justifications for exclusion from the relevant forum satisfy the requisite standard.'" *Id.* at 735 (quoting *Cornelius*, 473 U.S. at 797).

At first glance, the parties do not seem to disagree about the first two steps. Appellees initially appear to accept that Appellants engaged in protected speech and agree that the Festival constituted a traditional public forum. Appellees do not, however, concede that the First Amendment empowered Appellants to act as they pleased, noting that the Bible Believers were not "free to create a disturbance or cause a threat to public safety." Appellees Br. at 32.

The parties certainly diverge at the third step. There, the relevant standard depends on whether Appellees' actions were content neutral. If Appellees acted in a content-neutral manner, as they argue, then their actions are subject to intermediate scrutiny. Appellees did not violate Appellants' free-speech rights as long as their actions were "reasonable restrictions on the time, place, or manner of protected speech . . . that [] are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). If Appellees' actions were content based, as Appellants contend, these actions must withstand strict scrutiny: they "must be narrowly tailored to promote a compelling Government interest," and there must be no less restrictive means available. *United States v. Playboy Entm't Group*, 529 U.S. 803, 813 (2000).

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 790 (citing

*Clark v. Community for Creative Non-*Violence, 468 U.S. 288, 295 (1984)). "The government's purpose is the controlling consideration" to determine whether actions were content based or content neutral. *Id.* at 791. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.'" *Id.* (quoting *Clark*, 468 U.S. at 293) (emphasis omitted) (citation omitted).

The WCSO's Operations Plan was content neutral. The Plan merely stated that the WCSO would ensure safety and keep the peace. Although the Plan mentioned that Bible Believers might appear and attempt "to provoke our staff in a negative manner and attempt to capture the negativity on video camera," it said nothing about regulating the content of their speech and nothing about imposing any prior restraints on Appellants. Instead, it merely flagged a potential source of conflict before emphasizing professionalism and the need for an even temperament. The Plan did not require that the WCSO take any actions other than keep the peace. Accordingly, the Plan did not create any content-based restrictions on speech. *See, e.g.*, *Potts v. City of Lafayette*, 121 F.3d 1106, 1111 (7th Cir. 1997) (holding that a plan designed "to prevent violence, protect persons at the rally, and protect property and businesses . . . while groups of differing viewpoints express their beliefs" and that also flagged the KKK as a potential source of conflict was content neutral).

Because the Plan is content neutral, WCSO could impose reasonable time, place, and manner restrictions on protected speech that were narrowly tailored to serve a significant governmental interest and that provided alternative channels for communication of the information. *See Ward*, 491 U.S. at 791. Given its basic design—which did not impose any restrictions and instead only offered the goals of providing a law enforcement presence, keeping the peace, and ensuring safety—the Plan did so. *See, e.g., id.*

B.

Even though the Plan was content neutral and subject to intermediate scrutiny, its implementation could abridge Appellants' freedom of speech. Indeed, Appellants argue that Deputy Chiefs Richardson and Jaafar's threatening to cite them for disorderly conduct if they did

not leave violated the First Amendment. Such a violation is "an independent species of prohibitions on content-restrictive regulations, often described as a First Amendment-based ban on the 'heckler's veto.'" *Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008). The heckler's veto principle recognizes that "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also Leonard v. Robinson*, 477 F.3d 347, 360-61 (6th Cir. 2007). "Accordingly, hostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker's message so long as the speaker does not go beyond mere persuasion and advocacy of ideas and attempts to incite to riot." *Glasson v. City of Louisville*, 518 F.2d 899, 905 (6th Cir. 1975).

Two Supreme Court cases from the mid-twentieth century—*Terminiello v. City of Chicago*, 337 U.S. 1 (1949), and *Feiner v. New York*, 340 U.S. 315 (1951)—provide some initial boundaries for the heckler's veto doctrine. In *Terminiello*, the Supreme Court reversed the criminal conviction of a controversial speaker who had been arrested and convicted under Chicago's "breach of the peace" ordinance. 337 U.S. at 4-5. Terminiello had been delivering a controversial speech to an audience of over 800 listeners in a Chicago auditorium while over 1000 protesters amassed outside. Despite police attempts to maintain order, the crowd grew angry and turbulent. *Id*. at 1. Over several dissents, the *Terminiello* Court dodged the issue of whether the Terminiello's speech itself had risen to the level of inciting a riot. Instead, the Court held that the statute under which Terminiello was convicted was impermissibly broad and infringed on the First Amendment because it "permitted conviction of [Terminiello] if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest" even if his conduct was not "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id*. at 4-5.

In *Feiner*, the Court upheld the disorderly conduct conviction of an activist who was arrested when two crowds—one hostile, one supportive—congregating around him began to threaten violence and overwhelm the two police officers on the street.

> [Feiner stood] on a large wooden box on the sidewalk, [] addressing [a crowd of "about seventy-five or eighty people"] through a loud-speaker system attached to an automobile. Although the purpose of his speech was to urge his listeners to

attend a meeting to be held that night in the Syracuse Hotel, in its course he was making derogatory remarks . . . .

340 U.S. at 316-17. The crowd "was restless[,] and there was some pushing, shoving and milling around." *Id.* at 317. The situation continued to escalate, and "[b]ecause of the feeling that existed in the crowd both for and against the speaker, the officers finally stepped in to prevent it from resulting in a fight." *Id.* After Feiner ignored instructions to stop speaking several times, the police arrested him. *Id.* at 317-18. The Supreme Court affirmed Feiner's conviction, referring to the "clear and present danger" standard from *Cantwell v. Connecticut*, 310 U.S. 296 (1940). *Feiner*, 340 U.S. at 320. The *Feiner* Court concluded:

> "A State may not unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions." But we are not faced here with such a situation. It is one thing to say that the police cannot be used as an instrument for the suppression of unpopular views, and another to say that, when as here the speaker passes the bounds of argument or persuasion and undertakes incitement to riot, they are powerless to prevent a breach of the peace.

*Id.* at 320-21 (quoting *Cantwell*, 310 U.S. at 308).

A quarter-century later, in *Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir. 1975), this court read *Terminiello* and *Feiner* to protect a peaceful speaker from a heckler's veto in a situation much tamer than the one here. Glasson sued under 42 U.S.C. § 1983 after a police officer destroyed a sign she had been holding and that had provoked onlookers "into grumbling and muttered threats" from a crowd across the street from Glasson. *Id.* at 901-02. Addressing *Feiner*, the *Glasson* court stated: "For over twenty years the Supreme Court has confined the rule in *Feiner* to a situation where the speaker in urging his opinion upon an audience intends to incite it to take action that the state has a right to prevent." *Id.* at 905 n.3. *Glasson* states police "must take reasonable action to protect from violence persons exercising their constitutional rights." *Id.* at 906. Nonetheless, the *Glasson* court also indicated that individual officers could prevent hostility "without having to respond in damages" by removing the speaker if the officers' conduct was reasonable and undertaken in good faith. As this court said in *Glasson*:

> [T]he law does not expect or require [officers] to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such

circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection . . . .

*Id.* at 909. "Courts should not 'second guess' police officers who are often required to assess a potentially dangerous situation and respond to it without studied reflection." *Id*. at 910.

Appellants argue that they did not incite the crowd at the 2012 Festival to violence and that Richardson and Jaafar therefore effectuated an impermissible heckler's veto when they threatened to cite the Bible Believers if they did not leave. The district court, however, reasoned that

> the actual demonstration of violence here provided the requisite justification for [Appellees'] intervention, even if the officials acted as they did because of the effect the speech had on the crowd. As in *Feiner,* where the Supreme Court approved of a breach of peace conviction for the reaction the speaker's speech engendered, [Appellees] were not "powerless to prevent a breach of the peace" in light of the "imminence of greater disorder' that Plaintiffs" conduct created.

*Bible Believers*, 2013 WL 2048923, at *11 (quoting *Feiner*, 340 U.S. at 321). We agree. "No one would have the hardihood to suggest that the principle of freedom of speech sanctions incitement to riot . . . . When clear and present danger of riot, disorder . . . or other immediate threat to public safety, peace, or order appears, the power of the State to prevent or punish is obvious." *Feiner*, 340 U.S. at 320 (quoting *Cantwell*, 310 U.S. at 308) (internal quotation marks omitted). As the Supreme Court explained in *Cantwell*, a speaker can incite to violence "even if no such eventuality be intended" by making statements "likely to provoke violence and disturbance of good order." 310 U.S. at 309.

The video from the 2012 Festival demonstrates that Appellants' speech and conduct intended to incite the crowd to turn violent. Within minutes after their arrival, Appellants began espousing extremely aggressive and offensive messages—*e.g.*, that the bystanders would "burn in hell" or "in a lake of fire" because they were "wicked, filthy, and sick"—and accused the crowd of fixating on "murder, violence, and hate" because that was "all [they] ha[d] in [their] hearts." These words induced a violent reaction in short order; the crowd soon began to throw bottles, garbage, and eventually rocks and chunks of concrete. Moreover, members of the crowd can be heard to shout "get them" and "beat the s*** out of them"; one Bible Believer was pushed to the ground. Chavez's face was cut open and bleeding from where he had been struck by

debris. And the crowd itself continued to swell and swarm, undeterred by the WCSO's attempts to contain it.

As in *Feiner*, the situation at the 2012 Festival went far beyond a crowd that was merely unhappy and boisterous; as Richardson explained to the Bible Believers, the threat of violence had grown too great to permit them to continue proselytizing. *See Feiner*, 340 U.S. at 320. Richardson had a reasonable good faith belief that the threat of violence was too high because the Bible Believers had already been subjected to actual violence. We reiterate that a state must not "unduly suppress free communication of views, religious or other, under the guise of conserving desirable conditions." *Cantwell*, 310 U.S. at 308. But, here, had the WCSO wanted merely to preserve desirable conditions, they could have intercepted the Bible Believers shortly after their arrival at the 2012 Festival. Instead, they allowed the Bible Believers to proceed until the threat of "violent retaliation and physical injury" became too great, at which point they "discharge[d] their duty of preserving the peace by . . . by removing the speaker[s] for [their] own protection." *Glasson*, 518 F.2d at 909. As such, Richardson and Jaafar's threats to cite Appellants for disorderly conduct if they refused to leave do not amount to effectuating a heckler's veto. Appellees conduct was objectively necessary under the circumstances. They did not violate Appellants' free-speech rights.

V.

Appellants also argue that their conduct at the 2012 Festival was protected by the Free Exercise Clause of the First Amendment and that Appellees violated this right. The Free Exercise Clause prohibits the government from regulating, prohibiting, or rewarding religious beliefs. *E.g.*, *McDaniel v. Paty*, 435 U.S. 618, 626 (1978). "This Clause protects not only the right to hold a particular religious belief, but also the right to engage in conduct motivated by that belief." *Prater v. City of Burnside*, 289 F.3d 417, 427 (6th Cir. 2002) (citing *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990)). The First Amendment right to free exercise

> embraces two concepts—the freedom to believe and the freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society. The freedom to act must have appropriate definition to preserve the enforcement of that protection.

*Cantwell*, 310 U.S. at 303-04. Conduct regulation and the freedom to act are at issue here.

In support of their claim that Appellees violated their free-exercise rights, Appellants largely rehash their free-speech arguments. They contend that Chavez's sincerely held religious beliefs compelled him to proselytize at the 2012 Festival, and that Appellees infringed Chavez's free exercise of religion when they silenced his speech. For their part, Appellees insist their actions were neutral actions designed to restore and maintain order. In particular, Appellees note that the Bible Believers were far from the only religious, or even Christian, entity at the 2012 Festival and that they were the only group threatened with citations because they were the only group creating a violent situation.

As described above in our analysis of Appellants' freedom-of-speech claims, the record supports Appellees' contention that they were regulating the safety of the festival attendees, including the Bible Believers—not regulating Appellants' religious conduct. Although robustly guarded by the First Amendment, religious conduct "remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 304. State actors may, as Richardson and Jaafar did here, "safeguard the peace, good order and comfort of the community, without unconstitutionally invading the liberties protected by the Fourteenth Amendment." *Id*. Accordingly, Appellants' free-exercise claim fails.

## VI.

Appellants further contend that Appellees violated the Fourteenth Amendment's Equal Protection Clause. The Equal Protection Clause provides that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately 'as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)). As the district court correctly recognized, Appellants' equal-protection claims are essentially a repackaged version of their First Amendment claims. *See Bible Believers*, 2013 WL 2048923, at *14 ("To the extent the equal protection and First Amendment claims coalesce, it may be said

that they rise or fall together."). As Appellants' First Amendment claims fail, so do their equal-protection claims.

Regardless of the standard of review we apply, Appellants first must show that they were treated differently from others who were similarly situated. *See Mt. Elliott Cemetery Ass'n v. City of Troy*, 171 F.3d 398, 406 (6th Cir. 1999). "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). Appellants fail to show disparate treatment.

Appellants contend that the members of the hostile crowd that surrounded them were similarly situated counter-protestors who were treated differently. Although we find this characterization dubious, it gains traction because Appellees also refer to the crowd as counter-protestors. Still, even if the hostile crowd was a counter-protest, its members were not treated differently from the Bible Believers. As the WCSO's Post-Operations Report indicates, officers attempting to control the crowd detained, cited, or arrested a number of people—just as they would have cited any Bible Believers had they refused to leave.

Appellants were treated no differently than the counter-protestors. Appellants' other potential disparate-treatment comparator would be the other religious groups at the Festival. Again, however, this comparison is inapt because the record does not indicate that any groups other than the Bible Believers travelled through the crowd shouting and bearing signs—let alone a severed pig's head. Bible Believers have failed to show that any of the other groups created a violent disturbance. Because Appellants are unable to show disparate treatment, their claim under the Equal Protection Clause fails.

VII.

Finally, Appellants assert that Wayne County[2] should be held liable for violations of their constitutional rights. A municipal liability claim under 42 U.S.C. § 1983 "must be examined by

---

[2]By suing Appellees Napoleon, Richardson, and Jaafar in their official capacities, Appellants merely sued Wayne County under a variety of different names. *See Everson v. Leis*, 556 F.3d 484, 493 n.3 (6th Cir. 2009).

applying a two pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the [municipality] is responsible for that violation." *Doe v. Claiborne Cnty.*, 103 F.3d 495, 505-06 (6th Cir. 1996). Because we do not find that Appellants suffered a deprivation of their constitutional rights, we need not address municipal liability under *Monell v. Depart of Social Services of City of New York,* 436 U.S. 658, 690 (1978), and its progeny.

VIII.

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Appellees.

---

Richardson and Jaafar were also named in their individual capacities, but because we do not find any constitutional violations, we need not analyze qualified immunity.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  This is an easy case.  Plaintiffs Ruben Israel and the Bible Believers came to the 2012 Arab International Festival ("Festival") to exercise their sincerely held religious beliefs.  Those beliefs compelled Plaintiffs to hurl offensive words and display offensive images at a crowd made up predominantly of children.  Defendants themselves admit that these words and images were protected by the Constitution.  A video shows Defendant Deputy Chief Dennis Richardson telling Israel that the Bible Believers must leave the Festival under pain of arrest because "what you are saying to them [the crowd], and they are saying back to you is creating danger."  This is a clear heckler's veto, breaching the principle that "hostile public reaction does not cause the forfeiture of the constitutional protection afforded a speaker's message so long as the speaker does not go beyond mere persuasion and advocacy of ideas [but rather] attempts to incite to riot."  *Glasson v. City of Louisville*, 518 F.2d 899, 905 (6th Cir. 1975).  The majority reaches the opposite result by misstating the law and slanting the factual record in favor of Defendants, the very parties who moved for summary judgment.  The law and the facts do not allow for this result.  I therefore respectfully dissent.

## I.     THE FIRST AMENDMENT AND ANGRY CROWDS

The First Amendment would hardly be needed if it applied only in a well-mannered marketplace of ideas.  Fortunately, the right to free speech includes the right to speak passionately.  The First Amendment "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.  Speech is often provocative and challenging."  *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).  The right to free speech also means that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment."  *Boos v. Barry*, 485 U.S. 312, 322 (1988) (quotation marks omitted).  These principles do not change just because an outrageous speaker is confronted by an outraged crowd—"[l]isteners' reaction to speech is not a content-neutral basis for regulation."  *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

The First Amendment therefore does not allow for a "heckler's veto." This means that "[p]articipants in an orderly demonstration in a public place are not chargeable with the danger, unprovoked except by the fact of the constitutionally protected demonstration itself, that their critics might react with disorder or violence." *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966) (plurality opinion). The law could not be otherwise, else "free speech could be stifled by the speaker's opponents' mounting a riot." *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 879 (7th Cir. 2011). Therefore, if the state cracks down on a speaker because his constitutionally protected expression stirs listeners to anger, that is a content-based restriction on speech that must survive strict scrutiny. *See Forsyth County*, 505 U.S. at 135–36.

However, if a rabble-rousing speaker leaves the First Amendment's protected confines, the heckler's veto principle does not apply. *See Glasson*, 518 F.2d at 905. We recognize a few limited classes of speech "the prevention and punishment of which have never been thought to raise any Constitutional problem." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2733 (2011) (quotation marks omitted). Two of these areas have particular relevance to the interactions between angry speakers and angry crowds—incitement to violence and fighting words.

The test for incitement was "firmly set out," *James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002), in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam). There are two elements: the speech must be "*directed* to inciting or producing imminent lawless action and [] *likely to incite or produce* such action." *Id.* at 447 (emphases added). Under *Brandenburg*, speech cannot constitute incitement unless the speaker intends lawlessness to result. *See James*, 300 F.3d at 698.

Fighting words are "those personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quotation marks omitted). Fighting words are defined solely by their impact on the "average person," *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997), and thus there is no requirement that the speaker intend his words to

provoke a violent response. *See Cantwell v. Connecticut*, 310 U.S. 296, 309–10 (1940);[1] *United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012). But because a reasonable listener interprets fighting words as an immediate "invitation to exchange fisticuffs," *Texas v. Johnson*, 491 U.S. 397, 409 (1989), only rarely would we find a speaker who hurls these invectives without some sort of intent to start trouble.

If a speaker goes beyond forceful rhetoric and veers into incitement or fighting words (or some other class of unprotected speech), the state can step in and sanction the speaker without raising constitutional concerns. But what if the speaker never utters incitement or fighting words, yet the listening crowd resorts to violence; must the police sit on the sidelines out of respect for the First Amendment? Of course not—"our Constitution, written for the ages, to endure except as changed in the manner it provides, did not create a government with such monumental weaknesses." *Gregory v. City of Chicago*, 394 U.S. 111, 125 (1969) (Black, J., concurring). Police have the ability to reasonably regulate the "time, place, or manner of protected speech," so long as the police actions are narrowly tailored to ensure the safety of crowd and speaker. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). But if these regulations do not contain the crowd and the threat of violence is extreme, law enforcement may be able to temporarily silence constitutionally protected speech.

This statement invites two follow-up questions: First, how much rowdiness does the First Amendment compel law enforcement to endure; and second, once law enforcement is permitted to step in and curtail speech, who should be the target of their actions—speaker or crowd? The answer to the first question has been framed in various ways, but they all boil down to a similar high standard: the speech must be "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello*, 337 U.S. at 4; *see also Cox v. Louisiana*, 379 U.S. 536, 552 (1965); *Edwards v. South Carolina*, 372 U.S. 229, 237 (1963); *Cantwell*, 310 U.S. at 308. Absent these conditions, peaceful and orderly speakers cannot be sanctioned.

---

[1]The majority reads *Cantwell* to mean that speech can constitute *incitement* even if the speaker does not intend to provoke violence. Maj. Op. at 13. The majority thus waives *Brandenburg* out of existence and ignores subsequent Supreme Court cases that have tied the cited portion of *Cantwell* to the fighting words doctrine. *See Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam) (citing *Cantwell*, 310 U.S. at 309); *Cohen v. California*, 403 U.S. 15, 20 (1971) (citing *Cantwell*, 310 U.S. at 309).

The second question has historically been more difficult to answer. Justice Frankfurter was of the opinion that "[i]t is not a constitutional principle that, in acting to preserve order, the police must proceed against the crowd, whatever its size and temper, and not against the speaker." *Niemotko v. Maryland*, 340 U.S. 268, 289 (1951) (Frankfurter, J., concurring, and also concurring in *Feiner v. New York*, 340 U.S. 315 (1951)). As with much of Justice Frankfurter's civil rights jurisprudence, however, this statement has never attracted unqualified approval. The Supreme Court appeared to recognize Justice Frankfurter's error as it was presented with a flood of cases where desegregation demonstrators were arrested for breaches of the peace. These decisions suggest that the principal duty of law enforcement is to protect those exercising their First Amendment rights, and to first attempt to control the lawlessness of others before turning against the speakers. *See* Erwin Chemerinksy, Constitutional Law 1040 (4th ed. 2011) (discussing *Edwards*, 372 U.S. 229; *Cox*, 379 U.S. 536; and *Gregory*, 394 U.S. 111). The police, after all, are constitutionally required to show restraint when faced with protected speech, even hostile speech. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 471–72 (1987). It follows that officers' principal duty is to protect the lawful speaker over and above the lawless crowd—the police "must take reasonable action to protect from violence persons exercising their constitutional rights." *Glasson*, 518 F.2d at 906; *see also Zamecnik*, 636 F.3d at 879; *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993). The exception to this rule was *Feiner v. New York*, 340 U.S. 315 (1951), a case where the Court affirmed the conviction of a protestor who was urging, in front of a "mixed audience," that African Americans "rise up in arms and fight for equal rights." *Id.* at 317. However, the Court also held that the speaker had "passe[d] the bounds of argument or persuasion and undertake[n] incitement to riot." *Id.* at 321. Before being disinterred by the majority and the district court, we had confined *Feiner* to the truism that when a speaker incites a crowd to violence, his incitement does not receive constitutional protections. *See Glasson*, 518 F.2d at 905 n.3.

It does not take much to see why law enforcement is principally required to protect lawful speakers over and above law-breakers. If a different rule prevailed, this would simply allow for a heckler's veto under more extreme conditions. Indeed, hecklers would be incentivized to get *really* rowdy, because at that point the target of their ire could be silenced. More perniciously, a contrary rule would allow police to manufacture a situation to chill speech.

Police officers could simply sit by as a crowd formed and became agitated. Once the crowd's agitation became extreme, the police could swoop in and silence the speaker. The First Amendment does not contain this large a loophole.

In our circuit, we have clarified how officers should react in these situations—where the speaker is protected, but the crowd is rowdy—by announcing a good faith defense:

> Ideally, police officers will always protect to the extent of their ability the rights of persons to engage in First Amendment activity. Yet, the law does not expect or require them to defend the right of a speaker to address a hostile audience, however large and intemperate, when to do so would unreasonably subject them to violent retaliation and physical injury. In such circumstances, they may discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection without having to respond in damages. Accordingly, whether a police officer must respond in damages for his actions is judged by whether his conduct was reasonable, considering all the circumstances, and by whether he acted in good faith. A police officer's stated good faith belief in the necessity or wisdom of his action is not dispositive of that element of the defense, but must be supported by objective evidence.

*Glasson*, 518 F.2d at 909. A few notes about the defense. First and foremost, the standard is objective good faith and reasonableness. As discussed above, an officer acting in good faith will more often than not attempt to protect the law-obeying from the law-breakers. We noted in *Glasson* that officers acting in good faith "*may* discharge their duty of preserving the peace by intercepting his message or by removing the speaker for his own protection." *Id.* (emphasis added). But it does not follow that anytime an officer removes a speaker, he is necessarily acting reasonably and with objective good faith. Second, the good faith defense does not even come into play until protecting the speaker "unreasonably subject them [that is, the police] to violent retaliation and physical injury." *Id. Glasson* therefore presupposes that officers must make an effort to place themselves between the crowd and the speaker, and that this duty only falls away once the officers themselves face serious threats of injury. If officers never place themselves in harm's way—never make *any* attempt to protect the speaker—it would be difficult to say that they exercised their duties in good faith.

With this framework in mind, the case before us essentially resolves itself. Plaintiffs' speech was protected by the First Amendment, as Defendants concede. Despite this fact, Plaintiffs were threatened with arrest because of the reaction of the crowd to Plaintiffs'

sermonizing. This is a heckler's veto. I would leave to the jury the matter of whether Defendants acted reasonably and in good faith, although the evidence in the record compellingly suggests that they did not.

The majority reaches the opposite result on each of these issues. First, the majority announces that Plaintiffs incited the crowd to violence—in other words, that Plaintiffs' speech was not protected by the First Amendment. We know this because the majority relies heavily on the discredited *Feiner*, which we have cabined to "situation[s] where the speaker in urging his opinion upon an audience *intends to incite* it to take action." *Glasson*, 518 F.2d at 905 n.3 (emphasis added). The majority also states baldly that Plaintiffs' "speech and conduct incited the crowd to turn violent." Maj. Op. at 13. Second, the majority implicitly concludes that the good faith defense from *Glasson* applies as a matter of law. *Id.* at 13–14. The majority is wrong on both counts.

## II.    PLAINTIFFS' SPEECH WAS PROTECTED BY THE FIRST AMENDMENT

The majority's first error is its conclusion that the First Amendment did not protect Plaintiffs' speech. This is not only wrong, it is dangerously wrong.

### A.    Defendants Have Waived Any Argument that Plaintiffs' Speech Was Not Protected

Any debate as to whether Plaintiffs' expression was protected should be a short one—Defendants have clearly and repeatedly waived the argument that Plaintiffs incited the crowd. As stated above, if speech constitutes incitement (or fighting words), it is not protected by the First Amendment as a general rule. It follows that if Defendants conceded that Plaintiffs' expression was protected, they necessarily conceded that the expression did not rise to the level of incitement. Defendants did precisely this. They did it before the district court. *See Bible Believers v. Wayne County*, No. 12-CV-14236, 2013 WL 2048923, at *6 n.7 (E.D. Mich. May 14, 2013). And they did it repeatedly on appeal, emphasizing that they "previously agreed that the activities at issue are protected by the Free Speech clause of the First Amendment," and that Plaintiffs' "continued arguments that their speech is protected are redundant, as this was already agreed to by the parties at the district court level." Appellees' Br. at 20, 28 n.10. Defendants have therefore waived any argument that Plaintiffs' speech was not protected by the First

Amendment—including an argument that their expression constituted incitement or fighting words. *See Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003).

Had Defendants expressly argued that Plaintiffs incited the crowd, they (and the majority) would have had to come to grips with the cases establishing the metes and bounds of incitement. As Defendants only vaguely argue incitement, they are able to do so in a vague and incomplete legal landscape. Anyone reading the majority's opinion, Maj. Op. at 13–14, would think that the last word on the meaning of incitement can be found in *Feiner*. This could not be more wrong. *Feiner* continues to be good law for the proposition that if a speaker incites a crowd to violence, he cannot benefit from the heckler's veto doctrine. *See Glasson*, 518 F.2d at 905 n.3. But the facts of *Feiner* simply do not constitute incitement as that doctrine has evolved over the past 60 years. *See supra* at 19; 5 Rotunda & Nowak, Treatise on Constitutional Law § 20.39(a) (5th ed. 2013); 1 Smolla & Nimmer on Freedom of Speech § 10:41 (2014).

As explained below, Defendants cannot show that Plaintiffs' expression violated the First Amendment when faced with the true law of incitement and fighting words. I would therefore take Defendants at their word and hold that they cannot argue that Plaintiffs' speech fell outside the protections of the First Amendment.

**B.      Plaintiffs' Speech Did Not Constitute Incitement or Fighting Words**

The tests for incitement and fighting words are clear and exacting. Speech cannot constitute incitement unless the speaker intends the speech to produce imminent lawlessness, and the speech is likely to produce that result. *See James v. Meow Media, Inc.*, 300 F.3d 683, 698 (6th Cir. 2002). Fighting words are only those few select utterances "likely to cause an average person to react [by] causing a breach of the peace." *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997). The facts in the record simply do not allow for either of these First Amendment exceptions to apply.

Plaintiffs spewed hateful and bigoted words during the course of their sermonizing, but there is no statement in the record that we can point to as clear evidence of *intent* to incite the listening crowed to riot. Plaintiffs' speech cannot be said to have advocated in favor of crowd violence. *Contra United States v. Williams*, 553 U.S. 285, 299–300 (2008). Plaintiffs did not

give the crowd detailed instructions on how to break the law. *Contra United States v. Fullmer*, 584 F.3d 132, 155 (3d Cir. 2009); *Rice v. Paladin Enters., Inc.*, 128 F.3d 233, 249–50 (4th Cir. 1997); *United States v. Freeman*, 761 F.2d 549, 551–52 (9th Cir. 1985) (Kennedy, J.). Plaintiffs did not seek to enlist the crowd to carry out a criminal act on Plaintiffs' behalf. *Contra United States v. White*, 610 F.3d 956, 960–61 (7th Cir. 2010) (per curiam). And we cannot objectively say that the greatly outnumbered Bible Believers conveyed a threat (other than the distant threat of God's damnation) with their proselytizing. *Contra United States v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012). Even assuming that Plaintiffs' speech contained violent imagery— depictions of suffering that awaited the crowd in hell—the First Amendment would still protect it. *See Glenn v. Holder*, 690 F.3d 417, 421–22 (6th Cir. 2012).

Plaintiffs' speech does not constitute fighting words any more than it constitutes incitement. Plaintiffs' words were not likely to prompt an "*average person*" to respond with violence. *Sandul*, 119 F.3d at 1255 (emphasis added). To reach this conclusion, we need do nothing more than look at the video—the average person at the Festival *did not* meet Plaintiffs with violence. To hold that Plaintiffs' words meet the fighting words test, we would need to amend the standard from "average person" to "average Muslim child," as if such a person existed. Moreover, the First Amendment strongly counsels that we should not allow the state to criminalize speech on the grounds that it is blasphemous—even so blasphemous that the average adherent to the offended religion would react with violence. *See Leonard v. Robinson*, 477 F.3d 347, 359–60 (6th Cir. 2007). "[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them." *Epperson v. Arkansas*, 393 U.S. 97, 107 (1968) (quotation marks omitted); *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001) (Alito, J.) ("[T]here is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs.").

### C. The Majority Reaches Its Conclusion by Reading the Facts in Favor of Defendants

It is hard to piece out, but the majority appears to hold that Plaintiffs incited the crowd based on three facts. First, Plaintiffs began sermonizing "[w]ithin minutes" of their arrival at the Festival. Maj. Op. at 13. Second, Plaintiffs' sermonizing was "extremely aggressive and

offensive." *Id.* And third, the majority vaguely references Plaintiffs' "conduct." *Id.* Before addressing these facts, the reader should be reminded of one fact the majority has apparently forgotten—this is an appeal from *Defendants'* motion for summary judgment, and we must construe all facts in the light most favorable to Plaintiffs. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

Once we look at the majority's facts through this lens, it becomes impossible to say that Plaintiffs incited the crowd. Yes, Plaintiffs began preaching as soon as they arrived at the Festival, and yes, their sermonizing was offensive. Plaintiffs have a response to these accusations. Israel has stated under penalty of perjury that, based on his "sincerely held religious beliefs, [he is] required to preach the Gospel of Jesus Christ, to try and convert non-believers, and to call sinners to repent." (R. 20-2, Israel Decl., at 174.) Israel's "street preaching and displaying signs, banners, and t-shirts with Christian messages and Scripture quotes" are simply an embodiment of his religious conviction. (*Id.*) The majority effectively dubs Plaintiffs' religious beliefs a fig leaf for their true purpose at the Festival—causing trouble. Courts should step very gingerly before making adverse factual findings about a person's religious convictions. *Cf. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014) ("This argument . . . addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable).").

The majority's reliance on Plaintiffs' unspecified conduct is equally specious. Presumably, the majority refers to the fact that Plaintiffs moved through the crowd as they sermonized. No one doubts that once a rowdy crowd formed, Defendants could have regulated Plaintiffs in an attempt to accommodate both Plaintiffs' right to free speech and the orderly operation of the Festival. *See Startzell v. City of Philadelphia, Pa.*, 533 F.3d 183, 197 (3d Cir. 2008). But Plaintiffs' conduct provided no grounds for criminal sanction—Plaintiffs were not jaywalking, obstructing traffic, or committing some other petty offense that would have allowed Defendants to take action. *See Cox*, 379 U.S. at 554–55. Plaintiffs' conduct only becomes an issue when it is paired with their protected speech. Calling speech "conduct" does not make it so.

Finally, the existence of a video of (a portion of) the Festival does not change our analysis of the record. In *Scott v. Harris*, the Supreme Court instructed that we should not accept one party's version of the facts when it "is blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. There, the Court rejected the nonmovant's version of how carefully a fleeing suspect had driven a car in light of the objective facts revealed in a video of the chase. *See id.* at 379–80. The key fact in our case, by contrast, is the question of Plaintiffs' intent. That is not a fact shown on the videotape—it is an idea that existed in the mind of the speakers. Jurors might conceivably find an intent to incite based on inferences drawn from Plaintiffs' sermonizing. We judges are prohibited from doing so.

The law and the facts in the record simply do not support the majority's conclusion that Plaintiffs' speech was not protected by the First Amendment. At best, we could say that this is a question for the jury. But there is no basis for the option the majority selected—to rule as a matter of law that Plaintiffs' sermonizing was not entitled to the protections of the First Amendment. Because Plaintiffs' speech was protected, and because the threat to arrest Plaintiffs was explicitly founded on the crowd's reaction to their speech, we have a heckler's veto.

### III.    WE CANNOT SAY THAT THE GOOD FAITH DEFENSE APPLIES AS A MATTER OF LAW

I now turn to the majority's second erroneous conclusion—that Defendants are entitled to the *Glasson* good faith defense. As a reminder, the individual Defendants will only be entitled to this defense if protecting the speaker "unreasonably subject[ed] them to violent retaliation and physical injury." *Glasson*, 518 F.2d at 909. Above all, Defendants must have acted reasonably and with objective good faith. *See id.* The record is replete with factual disputes that prevent us from ruling for Defendants on either of these grounds.

First, unlike the majority, the district court, and both parties, I do not see an incipient riot when I view the video of the Festival. The crowd listening to Plaintiffs was made up predominantly of children. Their volume and rambunctiousness do not appear much different from other groups of sugar-addled youngsters at a carnival. Throwing debris—mostly plastic bottles by the looks of things—is inappropriate, perhaps criminal, but does not evidence an unreasonable threat to life and limb. The more serious crimes, such as throwing rocks, appear to have happened just a few times. I do not dispute that the crowd became angry and agitated. But

a fair look at the video shows that the crowd maintained its composure.  Indeed, the most contentious altercation captured on film was an argument about the relative merits of the Islamic and Christian methods of prayer.  Perhaps this was not a marketplace of ideas, but it was at least a trading floor for them.

Second, I see little evidence that Defendants behaved reasonably and with objective good faith as they dealt with the situation before them.  To find that Defendants acted reasonably, the majority puts a pro-Defendant gloss on several key facts.  The majority sees officers "hover[ing] at the edges of the crowd," and even sees "some mounted units[] attempt[ing] to quell the crowd."  Maj. Op. at 6.  I saw no such police presence—apart from a few officers standing around doing next to nothing.  As for the mounted units, they simply rode through the crowd at one point, making no obvious attempt to "quell" anything.  Further, the majority apparently accepts Defendants' contentions that they did not have enough officers at the Festival to provide any security for Plaintiffs whatsoever.  I seriously doubt that Defendants would have needed a sizeable police presence to control a crowd of children.  But even if more officers were needed, the record suggests that those officers were available.  Defendants themselves aver that they dedicate more police to the Festival than they do to a presidential visit or the World Series.  There were also enough officers on hand for about a dozen of them to mill about Plaintiffs' van as it was stopped for not having a license plate.

In my view, the video tape shows that Defendants did just about nothing to control the crowd as it grew and became agitated.  Defendants only stepped in to inform Plaintiffs that the police were powerless and that Plaintiffs needed to leave under threat of arrest.  This is not good faith—it is manufacturing a crisis as an excuse to crack down on those exercising their First Amendment rights.  Jurors, not judges, should decide this issue.

Regrettably, law enforcement officers have a track record of chilling the free speech rights of proselytizers at the Festival.  *See Saieg v. City of Dearborn*, 641 F.3d 727, 740–41 (6th Cir. 2011).  The majority's holding in this case effectively undermines this Circuit's prior holdings which have sought to protect First Amendment interests in Dearborn under difficult circumstances.  *See id.* at 740.

**CONCLUSION**

The majority misstates the law and misconstrues the facts to hand this case to Defendants. The First Amendment protects Plaintiffs' speech, however bilious it was. As for the good faith defense, there are too many issues of fact to be resolved on summary judgment—especially on Defendants' motion for summary judgment. The majority retreats from our commitment in *Saieg* to the principle that the First Amendment cannot be shut out of the Festival, and by so doing provides a blueprint for the next police force that wants to silence speech without having to go through the burdensome process of law enforcement. I expect we will see this case again.